80 N.J. Super. 443 (1963)
194 A.2d 20
DAVID F. CONROY, SR., CHIEF OF THE BUREAU OF SECURITIES OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
MORTIMER L. SCHULTZ, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided September 26, 1963.
*444 Mr. John W. Hayden, Jr., Deputy Attorney General, for plaintiff (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
Mr. Grover C. Richman, Jr. for defendant (Messrs. Richman, Berry & Ferren, attorneys).
MINTZ, J.S.C.
The Chief of the Bureau of Securities of the State of New Jersey seeks to enjoin the defendant, Mortimer L. Schultz ("Schultz"), from issuing, selling or engaging in the sale of securities. The complaint charges the defendant with having engaged in such activities without being registered as a broker-dealer or agent in this State, as required under N.J.S.A. 49:3-9, and further, that in connection with the offer, sale and assignment of securities, defendant directly and indirectly has employed and continues to employ devices, schemes, and artifices to defraud, contrary to the provisions of the Uniform Securities Law, N.J.S.A. 49:3-1 et seq.
Plaintiff obtained an order to show cause with an ad interim restraint. Defendant filed an answering affidavit which, in effect, constituted a general denial. A summary hearing was held, at which time the State produced several witnesses. Defendant did not produce any witnesses nor did he testify.
Defendant was engaged in the real estate syndication business. At all times mentioned herein defendant was the principal stockholder of Office Buildings of America, a New Jersey corporation (hereinafter referred to as "OBA"), holding 38% of the issued stock. Additionally, he was president, chairman of the board of directors, and the dominant personality in its over-all operation.
*445 In most instances OBA entered into various contracts to acquire real estate, consisting of shopping centers and other income-producing properties in and without the State of New Jersey. Thereafter, limited partnerships were formed in New Jersey pursuant to N.J.S.A. 42:2-1 et seq. In each syndication, except High Point Gates Associates, Schultz was the sole general partner. Generally, the limited partnership supplied the necessary funds with which to close the title. Thereafter OBA conveyed the property to the limited partnership and entered into a net lease-back arrangement with it whereby the investors in the particular partnership were to receive a net annual return of 9% to 10% on their investment. In connection with out-of-state acquisitions, the procedure varied slightly in that the limited partnerships were not formed until the title passed to OBA, although the investors supplied OBA with the necessary funds.
First Jersey Securities Corporation (hereinafter referred to as "First Jersey"), registered as a broker-dealer under the Uniform Securities Law, issued a prospectus to the public at large, describing the various ventures in New Jersey and offering unit participations in the respective limited partnerships. Each prospectus was prepared and circularized under the direction and approval of Schultz. All the stock in this corporation was held by Rosanna Schultz, defendant's wife, as custodian for their four children.
Harold Stevens, sales manager for First Jersey, and other sales personnel actively solicited the general public to initially invest in New Jersey ventures and promoted and solicited resales of units in both New Jersey and out-of-state properties. In his operations he was guided, supervised and directed by Schultz.
In connection with out-of-state promotions such as San Mac Associates ("San Mac"), the initial investors were directly solicited by defendant and consisted of his business acquaintances and friends. Schultz also personally negotiated for the initial sale of participating units in New Jersey ventures as well as the assignments of the same.
*446 First Jersey Servicing Company, a trade name for Schultz and described by Raymond F. White, Secretary of OBA, as the "Managing Agent" for the various syndications, was the conduit through which monthly distributions were made to holders of units in the limited partnerships. In effect, this servicing company, which received management fees from the limited partnerships, performed only an accounting function. At the end of 1962 First Jersey and First Jersey Servicing, at the behest of Schultz, were acquired by OBA.
Schultz, as chief executive for OBA, made all major decisions until his resignation on May 28, 1963. He masterminded the operations of First Jersey. As the sole general partner in all limited partnerships, except High Point Gates Associates, he was invested with the sole right of management and conduct of the partnership business.
Defendant owned 43 participation units in "San Mac" from the inception on September 28, 1960 until October 12, 1962. During this same period he transferred 65 units to the general public, retaining two units in his account.
The limited partnership, Wiss Building Associates ("Wiss"), owns property on Broad Street in Newark, N.J. Defendant owned 8 1/2 "Wiss" participation units between the dates November 1, 1960 and July 1, 1962. Within said period he transferred 38 1/2 participation units to the general public. In brief, he purported to sell units which he did not own in each of the respective limited partnerships.
In order to control and conceal the sale of these participating units beyond those which he owned, Schultz instructed OBA's assistant bookkeeper, Marie D. Hoynack, to prepare separate ledger accounts for these investors. Defendant ordered these special ledger sheets to be kept separate from the general partnership accounts and to allow no one access to them. Mrs. Hoynack further identified the special accounts and the checks sent to the investors representing their monthly distributions on these accounts by the symbol "X." Upon her termination of employment in the latter part of December 1961, the special accounts were maintained by *447 Sherman Hirschfeld, comptroller of OBA, under the supervision of Schultz.
Illustrative of defendant's manipulations in the sale of participation units were his transactions with William Marianni. On November 17, 1960 Marianni purchased 20 participation units of "San Mac" from Schultz for $35,000. However, Schultz credited Marianni with only ten units on the regular partnership books and debited his own account with ten units. Defendant created a special ledger or "X" account for Marianni in which it was shown that he had purchased ten additional units from Schultz.
On June 1, 1961 Marianni purchased two units of "San Mac" from Schultz for $3,500. This purchase was only shown on the special ledger or "X" account, there being no credit given him on the regular partnership books.
In March 1961 Marianni purchased from Schultz 13 1/2 units of "Wiss." Marianni was not credited on the regular partnership books of "Wiss," but a special ledger or "X" account was created to show the purchase. It was urged by counsel for defendant that the transfer of the 13 1/2 units in "Wiss" to Marianni was intended as security for the repayment of a $50,000 loan and did not constitute a sale. The documentary evidence and Marianni's testimony do not support this contention. At best, Schultz held an option to repurchase 13 1/2 units in "Wiss" from Marianni which he failed to exercise.
On April 1, 1962 the ten units of "San Mac" credited to Marianni on the regular partnership books were transferred to Robert Weiss. Mr. Albert, a certified public accountant directed by the Attorney General's office to examine the partnership books, testified he could not locate an assignment to support this transfer. As of that date the special or "X" accounts indicated Marianni had purchased a total of 22 units of San Mac from Schultz.
On December 1, 1962, 22 units of "Wiss" were transferred to Marianni on the regular partnership books of "Wiss." In conjunction with this transfer Marianni was removed from *448 the special accounts of "San Mac" and "Wiss." There was no assignment by Marianni to support this transfer. Mr. Sherman Hirschfeld testified that he entered the transaction on defendant's assurance that this arrangement orally transpired between him and Marianni. Marianni denies any such conversation. He testified that he first received knowledge of this transaction on March 13, 1963 when he received an accounting slip from OBA for income tax purposes. He further testified that he contacted Schultz, who told him that the transaction would be in his (Marianni's) best interest. Marianni indicated that any transaction must be in writing, but subsequent meetings between the parties produced no such document.
As noted above, at one point Schultz had sold to Marianni 13 1/2 units in "Wiss" and 22 units in "San Mac," entries for which were made in the special or "X" accounts. He endeavored to bail out from this untenable position in the following manner. He entered into a contract to purchase the Jordan Building, which adjoins the Wiss Building in Newark. The Wiss partnership, through defendant, amended its certificate to provide for the issuance of 116 additional units. Defendant had full power under the partnership agreement to amend the certificate without the consent of any limited partner. He assigned the contract to the partnership in consideration of the transfer of 76 participation units to himself personally, each unit having a face value of $5,000. He then assigned 22 of these units to Marianni on the regular partnership books of "Wiss" as of December 1, 1962. While the details of the contract to purchase the Jordan building and the assignment of the same by Schultz to "Wiss" were not presented to the court, suffice it to say that when Schultz informed his attorney of his intention to secure 76 additional "Wiss" units for assigning the contract, he was advised by said attorney not to make the assignment, that it was an unconscionable profit, and that "it would never stand up in court."
Finally, on February 22, 1963 the 22 participation units that Marianni was shown to own in "Wiss" were transferred *449 to OBA. The assignment alleged to represent this transaction was signed by Schultz as nominee for Marianni and as nominee for OBA. Since that date the records of "San Mac" and "Wiss" disclose that Marianni owns no investments in either limited partnership, but he appears on the books as a creditor of OBA. Marianni testified that he first became aware that his status was changed from limited partner to creditor in June 1963. He further testified, and I so find, that he never authorized Schultz to sign his name as nominee or authorized transfer of his interests by defendant to OBA.
The record clearly supports a finding that Schultz knowingly engaged in the sale and transfer of nonexistent limited partnership interests in "San Mac" and "Wiss," which he untruthfully held out to be valid transactions. I further find that Schultz engaged in the sale and assignment of Marianni's interests in "San Mac" and "Wiss" without authorization, and that he directed and supervised the maintenance of the special or "X" account ledger sheets in "San Mac" and "Wiss" as a means of concealing his manipulations in the sale of limited partners' interests, and in the sale of nonexistent interests in said partnerships. Schultz's conduct was not only fraudulent within the usual construction afforded the term "fraud" in courts of law and equity, but also as more particularly defined in N.J.S.A. 49:3-2(e) (5), which statute labels as fraud any device, scheme or artifice to defraud in connection with the offer, sale or purchase of any security.
Additionally, it appears that defendant acted as an agent in the sale or attempted sale and resale of participation units without being registered, as required by N.J.S.A. 49:3-9(a). N.J.S.A. 49:3-2(b) defines "agent" as:
"* * * any individual other than a broker-dealer who represents a broker-dealer or issuer * * * in effecting or attempting to effect purchases or sales of securities. * * *"
Schultz personally solicited his business acquaintances and friends in the promotion of "San Mac." In addition he negotiated for the sale and resale of participation units in "Wiss." *450 Clearly, such activity constituted the defendant an agent within the meaning of the act.
It was urged that the sale of participation units in limited partnerships does not constitute dealing in "securities" as defined under the Uniform Securities Law (N.J.S.A. 49:3-1 et seq.), and therefore that statute may not be invoked against defendant. N.J.S.A. 49:3-2(m) states that:
"`Security' means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement including but not limited to certificates of interest or participation in real or personal property; collateral-trust certificate; pre-organization certificate or subscription; transferable share; investment contract; * * *." (emphasis supplied)
The Uniform Securities Law, promulgated in January 1961, supplements the Federal Securities Act of 1933, 15 U.S.C.A. § 77a et seq., which covers the sale of securities interstate but exempts securities sold intrastate. Our Legislature, in defining the word "security," unequivocally followed the definition in the federal act of 1933, section 2(1). However it deemed it necessary to add one sentence to the federal definition. After including within the meaning of securities certificate of interest or participation in any profit-sharing agreement, the quoted state statute embodies the clause "including but not limited to certificates of interest or participation in real or personal property." This specific clause, in addition to the otherwise broad definition of "security," plainly indicates that the sale and resale of participation units in "Wiss" and "San Mac," as hereinbefore detailed, constituted transactions in securities within the statutory definition of "security." Federal decisions under the Securities Act of 1933 support this conclusion.
Twice the United States Supreme Court has found an equivalency between "security" and the public sale of direct interests in real estate. In Securities & Exchange Commission v. C.M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), defendant, after acquiring a lease upon 4,700 acres of potentially oil-bearing land, sought to *451 raise development funds by public subscription. The investors received partial assignments of the dominant leasehold. In addition, Joiner contracted with each investor to conduct oil explorations upon the dominant leasehold. In finding that these leasehold interests are securities under the act, the Supreme Court declared:
"* * * the reach of the [Securities] Act does not stop with the obvious and commonplace. Novel, uncommon * * * devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as `investment contracts,' or as `any interest or instrument commonly known as a "security." * * *'" (320 U.S., at p. 351, 64 S.Ct., at p. 123, 88 L.Ed. 88)
In Securities & Exchange Commission v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), defendant owned large tracts of Florida's citrus acreage. It publicly offered for sale strips of land transferable by warranty deed. In addition, service contracts were available by which defendant agreed to cultivate the acreage and pay the net profits to the owners. The court, in finding the transaction to fall within the definition of "security," stated:
"An investment contract for purposes of the Securities Act means a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."
The court then concluded:
"Thus all the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. It follows that the arrangements whereby the investors' interests are made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed. * * *"
Sister states, in dealing with syndications strikingly similar to those here presented, have adopted the rationale of *452 Joiner, supra, and Howey, supra, and have held that such participation units are "securities." See McElfresh v. State, 151 Fla. 140, 9 So.2d 277 (Sup. Ct. 1942); State v. Whiteaker, 118 Or. 656, 247 P. 1077 (Sup. Ct. 1926) (partnership interest a security); People v. Hoshor, 92 Cal. App.2d 250, 206 P.2d 882 (D. Ct. App. 1949) (limited partnership a security). See also 69 Yale L.J. 725, 775.
In Sire Plan Portfolios, Inc. v. Carpentier, 8 Ill. App.2d 354, 132 N.E.2d 78 (App. Ct. 1956), a syndication was formed whereby Sire (defendant) sold units in income-producing realty, and money received from the investors was held by trustees appointed by Sire. After closing of title the trustees would lease the realty to Sire and convey to the unit purchasers their proportionate interests in the property as tenants in common. This transaction was found to be a sale of a security under the Illinois Security Law. The Illinois statutory definition is identical with the Federal definition.
It is unnecessary for this court to determine whether or not the issuance or transfer of participation units or certificates of interest in real property by a genuine limited partnership, per se, constitutes dealing in securities under the Uniform Securities Law. For, in the instant situation, "Wiss" had prepared for it a prospectus issued to the public at large. Sales personnel of the so-called "underwriter," First Jersey, solicited and promoted the sale and resale of "Wiss" and "San Mac" participation units. Assignees of units in each syndication were furnished assignments which state that the assignee becomes a substituted limited partner to the extent of units assigned subject to the approval of the general partner. However, the assignment expressly provides that the failure or refusal of the general partner to grant such approval shall not affect the validity of the assignment. The actual unhampered transferability of a limited partner's interest is certainly at variance with the conventional partnership relationship. R.S. 42:2-23, 42:2-29. The participation units were, in fact, as negotiable as ordinary stock certificates. Generally, the limited partners were attracted solely *453 by the prospect of a return on their investments, and were indiscriminately selected on the basis of available funds. Finally, the limited partners expected profits solely from the efforts of the promoter and general partner, Schultz. Cf. Rivlin v. Levine, 195 Cal. App.2d 13, 15 Cal. Rptr. 587 (D. Ct. App. 1961). Suffice it to say that under the facts here presented, defendant engaged in the sale of or the offering to sell "securities" within the purview of N.J.S.A. 49:3-2(m).
Since it plainly appears that defendant has engaged in illegal practices prohibited under the Uniform Securities Law, he is enjoined from continuing such practices or engaging in or doing any acts in furtherance thereof. N.J.S.A. 49:3-17(b). Additionally, in the light of the frauds committed by Schultz, he is hereby enjoined from issuing, selling, offering for sale, purchasing, offering to purchase, promoting, negotiating, advertising, or distributing from or within this State, any securities as the term security is defined by N.J.S.A. 49:3-2(m), and as construed herein.
In addition to "Wiss" and "San Mac," defendant organized the following limited partnerships:
 Carteret Center Associates
 Deauville Arms Associates
 High Point Gates Associates
 Lawrence Center Associates
 Neptune Center Associates
 Park Central Associates
 Post Oak Associates
 Royal Palm Associates
 Sayre Woods Center Associates
Generally speaking, the same program under the direction and control of Schultz was adopted to attract investors. Obviously, the sale or offering of sale by defendant of participation units in said partnerships constitutes dealings or attempted dealings in securities and is likewise enjoined.
A form of judgment consistent with the views herein expressed will be presented, consented to as to form or to be settled on notice.