**In re GARDEN MANOR ASSOCIATES, L.P., Debtor.**

Bankruptcy No. 88 B 11625 (TLB).

United States Bankruptcy Court, S.D. New York.

Dec. 23, 1988.

Rivkin, Radler, Dunne & Bayh by Martin F. Brecker, New York City, for debtor.

Summit, Rovins & Feldesman by Alan Kolod and Alan E. Gamza, New York City, for Federal Nat. Mortg. Ass'n.

## DECISION AND ORDER ON MOTION TO TRANSFER VENUE

TINA L. BROZMAN, Bankruptcy Judge.

Federal National Mortgage Association (FNMA) moves to transfer venue of the case of Garden Manor Associates, L.P., (Garden Manor) the debtor, to the United States Bankruptcy Court for the District of Arizona. FNMA contends that the requirements for proper venue as set forth in 28 U.S.C. § 1408 have not been met or, alternatively, if venue is proper, the case should be transferred pursuant to 28 U.S.C. § 1412 in the interest of justice or for the convenience of the parties. A trial was held on November 4, 1988 following which the parties submitted proposed findings of fact and conclusions of law.

On July 26, 1988, Garden Manor filed a petition under chapter 11 of the Bankruptcy Code. Its sole asset is a garden apartment complex located in Sierra Vista, Arizona. The debtor, a limited partnership organized under the laws of New Jersey, consists of thirty-two limited partners and one general partner, Allstate Property Investors Corp. (Allstate), a Delaware corporation with its place of business in New York. Twenty limited partners are from New York, nine from New Jersey, and one each from Georgia, Pennsylvania and Arizona. Allstate has three stockholders, Harold Pomeranz, Andrew Lynette, and Richard Diller, who are engaged in a real estate business, under the corporate name Equity Programs, Ltd. (Equity), which works out of One Penn Plaza, New York, New York. Equity's business consists of acquisition of real estate for future syndications, syndications, and real estate management on a temporary basis until the property is sold. Thus far, Equity has formed 37 partnerships, all but one or two of which were filed and registered in the state of New Jersey because of its favorable laws.

The management of Garden Manor's property has twice undergone change. At the time of the property's acquisition in late 1985, Equity Realty Management Corp. (Equity Realty), an affiliate of Equity and a New York corporation with its office

in New York, entered into a management agreement pursuant to which Equity Realty was responsible for the primary management of the apartment complex. Equity Realty employed several onsite people to handle the day to day affairs of the property and a district manager, Larry Hieb, whose office is in Arizona, to provide guidance and direction to the onsite people. Both the onsite people and Hieb report to Philippa Warfield in New York, the president of Equity Realty. Between the time of acquisition of the apartment complex and April, 1987, Garden Manor maintained four bank accounts, three trust accounts in New York and one operating account in Arizona. The only people who had power to sign on any of these accounts were Pomerantz, Diller, and Lynette. The checks generated from Garden Manor's business were deposited into the Arizona account and then the New York office drew a check to transfer the funds to the New York account. Bills were paid from New York although certain of them were pre-approved at the local level before their transmission to New York for payment. All books and records of Garden Manor were prepared and maintained in New York.

Then, in April 1987, because of a change in another of Equity's affiliates, Equity Realty entered into a subcontract with an independent contractor, Paul Ash Investment Co. (Ash), to act as the onsite managing agent. Ash was permitted to write checks on the Arizona account and did not need permission to pay operating bills that did not exceed $1000. For bills over $1000, Ash had power to issue checks if he obtained prior approval from New York. After paying the local bills, Ash would send a check to Equity Realty representing the excess cash flow. Whatever tax, mortgage and insurance payments were made, were at all times made from New York. Ash was responsible for all day to day affairs, although he spoke with Warfield in New York, and followed her instructions. The balance of the operations remained the same as before.

The second change occurred in February 1988 when, during the course of mortgage foreclosure proceedings instituted by FNMA, Paul Ash was appointed receiver of the property. He continues in that capacity to this date.[1] Under this arrangement, Ash was no longer legally obligated to take instructions from Garden Manor or Equity Realty, but he has continued to follow the guidance and instructions provided by Hieb and Warfield. Also, Equity Realty has continued to prepare the budgets, operating and financial statements, and tax returns. Further, it has continued to visit the property on a regular basis.

Throughout the course of Garden Manor's ownership of the property, Equity Realty and Allstate have performed a supervisory management function. Warfield, on a regular basis, has consulted by phone, mail and in person with the onsite managers and Hieb. Equity Realty was until the appointment of the receiver responsible for running the property and making the primary management decisions, including approval of budgets, approval of rental rates and terms, marketing plans, and expenditures. The three shareholders of Allstate are the only parties who have any right to sign for the partnership or make final decisions. In fact, Equity Realty and Allstate continue in these roles. The internal bookkeeping and financial reports were and are prepared in Equity Realty's office in New York. The accounting and tax returns were and are prepared in New York and list Garden Manor's address as being care of Equity, One Penn Plaza, New York, New York. The debtor's insurance is arranged and paid for from the New York office. Garden Manor has never maintained its own office either in Arizona or New York, nor was it ever listed on the door or directory at Equity/Equity Realty's New York office. But the limited partners and Arizona creditors have been able to communicate and in fact have communicated with the debtor through the Equity/Equity Realty office.

1. Garden Manor's motion to regain possession of its property has been held in abeyance by   agreement of the parties.

28 U.S.C. § 1408 governs whether or not a bankruptcy petition was filed in the proper district. A case may be filed in the district in which the debtor has its domicile, residence, principal place of business or principal assets for the 180 day period immediately preceding the filing or for the longest portion of such period. The burden of proof in a venue motion is on the movant, the standard being a preponderance of the evidence. *In re Bell Tower Associates, Ltd.,* 86 B.R. 795, 798–99 (Bankr.S.D.N.Y. 1988). Where the debtor is a partnership, the only meaningful test for venue is the principal place of business or the location of principal assets. *Id.* at 799; *see also* 1 L. King, *Collier on Bankruptcy,* ¶ 3.02[c][ii] at 3–118 (15th ed.1988). The principal place does not necessarily have to be the place where the sole asset is located, but is often where major business decisions are made. *In re Landmark Capital Co.,* 19 B.R. 342, 347 (Bankr.S.D.N.Y.), *aff'd sub nom. Landmark Capital Co. v. North Central Devel. Co.,* 20 B.R. 220 (S.D.N.Y. 1982); *see, e.g., In re Pavilion Place Associates,* 88 B.R. 32 (Bankr.S.D.N.Y.1988).

■ The testimony adduced at trial showed that only the day to day decisions regarding the management of the property are made in Arizona. Lynette, Pomerantz, and Diller, together with Warfield, all located in New York, made the major business decisions for the debtor. The appointment of a receiver for the property did not change this. The fact that Equity Realty, by virtue of its contract with the debtor, was responsible for many of the management decisions is of no moment, for Equity, of which Equity Realty is an affiliate, is solely owned by the same three people as is Allstate, the general partner of Garden Manor which is vested with sole responsibility for the operation of the business. *See* 43 N.Y.Jur., Partnership § 284 (1965), citing *Durant v. Abendroth,* 97 N.Y. 132 (1884) ("The management of the property and business of a limited partnership is vested exclusively the general partners."); *see also Conroy v. Schultz,* 80 N.J.Super. 443, 194 A.2d 20, 21 (Ch.Div.1963). Moreover, the only set of books and records is prepared and maintained in New York, and the major bank accounts of the debtor are in New York with sole signatory power vested in Lynette, Pomerantz and Diller. No evidence was adduced by FNMA respecting any changes in bookkeeping or bill paying since the advent of the receivership, although excess cash flow was paid to FNMA prior to the bankruptcy. Accordingly, FNMA has not met its burden of showing that the principal place of business is not in New York.

■ Despite the fact that venue is proper, it may be transferred in the interests of justice or for the convenience of the parties. 28 U.S.C. § 1412. The burden of proof is the same as where the propriety of the venue is at issue. *See Landmark,* 19 B.R. at 344. Whether to transfer venue rests within the sound discretion of the court taking into consideration the following factors: "(1) the proximity of creditors of every kind to the Court; (2) The proximity of the bankrupt (debtor) to the Court; (3) The proximity of the witnesses necessary to the administration of the estate; (4) The location of the assets; (5) The economic administration of the estate; [and] (6) The necessity for ancillary administration if bankruptcy should result." *In re Commonwealth Oil Refining Co., Inc.,* 596 F.2d 1239, 1247 (5th Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980) (decided under the former Bankruptcy Act and Rules).

FNMA, the debtor's only secured creditor, is located in Los Angeles, California; so whether the case is in New York or Arizona, FNMA will have to travel. Further, since the beginning of FNMA's relationship with the debtor, all communications between them have been through the New York office of Equity Realty. There are 115 non-insider unsecured creditors listed on the petition filed by Garden Manor of which 107 are tenants holding claims for the return of their security deposits. Because Garden Manor has been authorized by order dated August 12, 1988 to refund the security deposits at the termination of each tenancy to the respective tenants, at this time there remain 47 non-insider unsecured creditors, including those tenants

whose security deposits are still being held. One of the unsecured creditors is located in New York, three are in California, and the balance are from Arizona, but most of the Arizona creditors are the unpaid tenants. The claims of the Arizona creditors total approximately $16,000, only five of which exceed $1000 (the maximum claim being $1721). Thus, the Arizona creditors have a small stake in the conduct of the bankruptcy case *per se*. The insider unsecured claims aggregate about $103,625 or approximately 85% of the total unsecured debt. While the location of the insider claimholders is less significant than that of the non-insiders, it is still a consideration. On balance, this factor does not weigh in favor of transfer of this case.

The proximity of the debtor factor weighs in favor of retaining the case in New York. The day to day operation of the apartment complex takes place in Arizona but the primary operations are conducted by the general partner in New York, which makes and will have to make all major decisions for the business. *See* discussion on pages 554–55, *infra*. In addition, the accounting, tax returns, budgets and financial statements are all prepared and the books and records are all maintained in New York. The taxes and insurance payments are made in New York.

In terms of the proximity of witnesses necessary to administration of the estate, there are three possible scenarios which we can anticipate that would require witnesses; in connection with FNMA's pending motion to lift the stay, at the time of confirmation or if the debtor seeks to enter into an agreement with a new lender, investor or purchaser. Thus, the required witnesses would be (1) local Arizona appraisers to assess the value of the property, which Garden Manor does not believe would be a significant issue because both sides agree that the value of the property is less than the total value of FNMA's mortgage, (2) the general partner, the accountants, and financial experts to testify as to the terms

of any payment proposal made in a plan of reorganization, its present cash value, and its feasibility, (3) the new lender, investor or purchaser, and (4) persons involved with or familiar with the management of the apartments. Allstate and the debtor's accountant are both from New York. While there is no way at this point to determine from where potential purchasers or lenders would hail, there is no reason to believe that they would be more likely to come from Arizona than from New York. There are people familiar with the management both in New York and Arizona. Thus, this factor does not weigh in favor of transfer.

Clearly, the location of Garden Manor's asset is in Arizona, but this fact is counterbalanced by the nature of the debtor's business and the course this reorganization will necessarily have to follow, which brings us to the factor regarding the economic administration of the estate. This factor is generally held to weigh most heavily in the determination of whether to transfer venue. *See Commonwealth Oil*, 596 F.2d at 1247. The court is required to focus on the place which will provide "for a more economical and efficient administration and therefore result in a more successful reorganization." *In re One–Eighty Investments, Ltd.*, 18 B.R. 725, 729 (Bankr.N.D. Ill.1981).

The debtor is in the business of renting and managing garden apartments. Unlike in *Pavilion Place Associates*, in which this court transferred venue of the case of a debtor which owned a shopping center with many vacancies and the need for structural changes,[2] here the testimony does not show that there is any significant vacancy rate at the property, any need to renegotiate existing leases or any need for construction to generate more income from the property. In fact, the testimony revealed that the property is fairly new and there has been no need for capital expenditures.

Thus, unlike *Pavilion*, this case will turn on whether the debtor can raise capital to fund a plan of reorganization, renegotiate its loan terms with FNMA, locate a pur-

---

**2.** This case is also distinguishable from *Pavilion* in that there, the unsecured creditors were

clearly rooted in the district in which the property was located whereas here they are not.

chaser for the property, or, should those efforts fail, cram down FNMA as the debtor asserts it can. Because the general partner conducts its business in New York, any efforts along these lines will necessarily take place in New York. The major business decisions emanate from New York, and anyone interested in obtaining information respecting the debtor's operation will have to communicate with the general partner or managing agent in New York. In addition, a likely source of capital is from the present investors in the property. Currently, 29 of the debtor's 32 limited partners are from the metropolitan area. Moreover, if the debtor is unsuccessful in its reorganization-aimed endeavors, FNMA will likely succeed in having the stay lifted and will foreclose on the debtor's sole asset, leaving nothing to administer in any court for unsecured creditors. Further, although the real estate is located in Arizona, it appears from the testimony that more of a custodial function is performed there and that the actual business is operated from New York. *See In re Holiday Towers, Inc.*, 18 B.R. 183 (Bankr.S.D.Ohio 1982); *cf. In re 2 Park Associates*, No. 87 B 10552 (BRL) (Bankr.S.D.N.Y. June 2, 1987) (where Judge Lifland declined on very similar facts to transfer venue of another limited partnership of which the general partner is an affiliate of Equity).

It thus appears that FNMA has not met its burden of demonstrating that the interest of justice or convenience of the parties will be furthered by transfer of this case to Arizona. A debtor's choice of forum is entitled to deference, and "[w]here a transfer would merely shift the inconvenience from one party to the other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed." 1 J. Moore, *Moore's Federal Practice* ¶ 0.145[5] at 1616 (2d ed.1988) citations omitted. For all of the foregoing reasons, the motion to transfer venue is denied.

IT IS SO ORDERED.