**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0967-19

IN THE MATTER OF ERIC J.
BRUNO and MIRAKILL
BRANDS, LLC.

_____

Submitted March 3, 2021 – Decided March 25, 2021

Before Judges Sumners and Geiger.

On appeal from the Department of Law and Public Safety, Division of Consumer Affairs.

Levenson Law, LLC, attorneys for appellants Eric J. Bruno and Mirakill Brands, LLC (Scott Levenson, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Bureau of Securities (Jane C. Schuster, Assistant Attorney General, of counsel; Evan A. Showell, Deputy Attorney General, on the brief).

PER CURIAM

Appellants Eric J. Bruno and Mirakill Brands, LLC (Mirakill), appeal a September 24, 2019 final order issued by Christopher W. Gerold, Chief of the New Jersey Bureau of Securities (the Bureau), that adopted the August 9, 2019

summary decision of Administrative Law Judge (ALJ) Thomas Betancourt in its entirety. We affirm.

We discern the following facts from the record. Mirakill was a Nevada limited liability company (LLC) with offices in Old Tappan, New Jersey. BBA Enterprises, LLC (BBA), was the managing member of Mirakill. Bruno owned fifty-one percent of BBA and served as its president.

Mirakill described its mission as developing a proprietary antimicrobial product designed to prevent the growth of harmful bacteria on high-contact surfaces. Mirakill and Bruno offered and sold membership interests and warrants called "units" to prospective investors. Prospective investors were provided with a confidential private placement memorandum (PPM) that "set forth the nature of the business, risks, executives, consultants, projected revenues, use of funds, together with other information." The PPM stated Mirakill intended to raise up to $2,500,000, to be used for administrative, production, and other uses in specified amounts.

Mirakill also provided prospective investors with an Interest Purchase Agreement (IPA) which confirmed they received the PPM and that their decision to invest was based on the information contained in the PPM. At least eight investors purchased interests and warrants, raising approximately $137,500.

2

The Bureau investigated Bruno and Mirakill to determine if they violated the Uniform Securities Law (1997) (the Securities Law), N.J.S.A. 49:3-47 to -76. The investigation included the deposition of Bruno and Gerard Adams, Mirakill's marketing and branding expert. Based on the documents and information compiled during the investigation, Bureau Chief Gerold made the following findings:

> 1. Eric J. Bruno, residing in River Vale, New Jersey, was the President of Mirakill from at least July 2013 to June 2014 (the "Relevant Period"). Bruno has never been registered with the Bureau in any capacity.
>
> 2. Mirakill was a Nevada [LLC] formed on July 1, 2013 and dissolved on June 12, 2014 with offices located [in] . . . Old Tappan, New Jersey. BBA Enterprises LLC ("BBA") was the managing member of Mirakill. BBA was a Delaware limited liability company formed on June 12, 2012. Bruno was the President of BBA and owned a 51% stake in the company. Bruno cancelled BBA's limited liability registration with the Delaware Secretary State on June 14, 2014.
>
> Offer and Sale of Unregistered Mirakill Securities
>
> 3. Mirakill purported to be a start-up business that would be developing an improved, proprietary antimicrobial additive designed to prevent the growth of harmful microorganisms with industrial uses including plastics, paints, and filters (the "Mirakill Product").
>
> 4. During the Relevant Period, [appellants] offered and sold unregistered securities in the form of membership

interests and warrants to buy membership interests in Mirakill. Each membership interest and warrant to buy a membership interest in Mirakill was sold as one "unit" (the "Mirakill Securities").

5. [Appellants] raised approximately $137,000 from the sale of the unregistered Mirakill Securities to at least seven New Jersey residents.

6. The Mirakill Securities are securities as defined in N.J.S.A. 49:3-49(m) of the Securities Law and were required by N.J.S.A. 49:3-60 to be registered with the Bureau, federally covered, or exempt from registration.

7. The Mirakill Securities were not registered with the Bureau, "federally covered" or otherwise exempt from registration.

8. In or about September or October 2013, [appellants], along with two other officers of Mirakill, held an event for prospective Mirakill investors. Approximately [thirty] to [forty] individuals attended. During the event, Bruno provided an overview of the Mirakill Product to the prospective investors, as well as its potential applications, and discussed the amount of funds that would be required to bring the Mirakill Product to market. After the event, several of the attendees purchased the Mirakill Securities.

9. Mirakill's investors were provided the Mirakill PPM describing the Mirakill Securities, the nature of Mirakill's business risks, executives, consultants, project revenues, use of funds, and other material information that would be useful to investors.

10. Mirakill investors were also provided a subscription agreement ("Interest Purchase Agreement") [(IPA)] to sign that was an exhibit to the

4

Mirakill PPM. The [IPA] confirmed that they had been provided a copy of the PPM and that their investment decision was based on the information contained in the Mirakill PPM. Bruno countersigned the [IPAs] as President of Mirakill.

11. In addition to countersigning the [IPA], Bruno personally met with certain investors, received and deposited investment checks, and received wire transfers into accounts that he controlled.

Misuse of Investor Funds

12. Investor funds were deposited or wired into an account ending in 1735 held in the name of Mirakill Brands, LLC at Oppenheimer & Co., Inc. (the "Mirakill Account"). The Mirakill Account was opened on August 27, 2013. Bruno and another office of Mirakill were the only authorized signatories.

13. Bruno and Mirakill, through Bruno, made material misstatements of fact to investors through the Mirakill PPM, which stated investor funds would be use for:

> a. administrative uses, including office space, salaries, and professional fees.
>
> b. production of the Mirakill Product, including purchase of raw materials, deposits, packaging, and other direction productions costs; and
>
> c. other business uses including intellectual property registration, working capital, research and development, and marketing of the Mirakill Product.

14. Contrary to the statements in the Mirakill PPM, and without disclosure to Mirakill investors, Bruno used

5

investors' funds for his own personal expenses and entertainment.

15. Bruno misused at least $82,000 of investor funds. The misuse of investor funds from the Mirakill Account included:

    a. Cash withdrawals at ATMs totaling $28,148;

    b. Automobile lease and insurance payments totaling $1,500;

    c. Debit card charges at restaurants, liquor stores, and grocery stores totaling $19,388;

    d. Debit card charges at a New York "gentleman's club" totaling $7,134;

    e. Limousine services totaling $2,222.18;

    f. Pharmacy, gas station, and convenience store purchases totaling $1,033; and

    g. Clothing and dry[-]cleaning expenses totaling $2,333.

16. Bruno also transferred $21,000 from the Mirakill Account to BBA's bank account at Wells Fargo ending in 5247, which he misused as follows:

    a. Debit card purchases at the same New York "gentleman's club" totaling $1,649;

    b. Cash withdrawals from ATMs and counter withdrawals totaling $18,108; and

6

A-0967-19

c. Debit card charges for other personal expenses including restaurant meals, limousine services, gasoline, and dry cleaning.

The Bureau Chief determined that appellants committed the following violations of the Securities Law:

18. Bruno and Mirakill, through Bruno, made untrue statements of material facts and/or omitted . . . material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to investors in connection with the offer and sale of securities.

19. Each omission or materially false statement constitutes a violation of N.J.S.A. 49:3-52(b).

. . . .

22. Bruno and Mirakill, through Bruno, offered and sold securities that were not registered with the Bureau.

23. The Mirakill Securities were required to be registered with the Bureau, federally covered, or exempt pursuant to N.J.S.A. 49:3-60.

24. Each offer or sale of unregistered securities constitutes a violation of N.J.S.A. 49:3-60 and is cause for the imposition of civil monetary penalties pursuant to N.J.S.A. 49:3-60.

. . . .

26. Bruno acted as an agent, as defined under N.J.S.A. 49:3-49(b), in effecting or attempting to

effect transactions in Mirakill Securities from and in New Jersey.

27. Bruno was not registered with the Bureau as an agent of Mirakill.

28. Bruno violated N.J.S.A. 49:3-56(a), which provides, among other things, that only persons registered with the Bureau may lawfully act as agents.

. . . .

31. Mirakill employed Bruno to act as an agent, as defined under N.J.S.A. 49:3-49(b), to attempt to effect transactions in securities in or from New Jersey.

32. Mirakill's conduct constituted employing an agent who was not registered with the Bureau in violation of N.J.S.A. 49:3-56(h).

On May 23, 2018, the Bureau Chief: (1) ordered Mirakill and Bruno to cease and desist from further violations of the Securities Law; (2) assessed a $100,000 civil monetary penalty against Mirakill and Bruno, jointly and severally, for their violations of the Securities Law; and (3) denied Mirakill and Bruno any exemptions under N.J.S.A. 49:3-50(a), (b).

Appellants filed a contesting answer and requested a hearing. In their answer, they admitted that Bruno "has never been registered with the Bureau in any capacity," but claimed that he met an exemption to register under N.J.S.A.

49:3-50(b) "because sales were made to less than ten (10) [New Jersey] residents." This matter was then transferred to the Office of Administrative Law as a contested case and assigned to ALJ Betancourt.

The parties cross-moved for summary decision pursuant to N.J.A.C. 1:1-12.5. The cross-motions were supported by voluminous certifications, exhibits, and the deposition transcripts. On August 9, 2019, ALJ Betancourt issued an Initial Decision granting summary decision to the Bureau, denying appellants' cross-motion, and affirming the Bureau Chief's May 23, 2018 summary order. The ALJ concluded that the evidence was "so one sided that [the Bureau] must prevail as a matter of law."

The ALJ excluded the unsworn certifications of Adam Bruno, Dr. Gregori Moriello, and Christine Schneidman from consideration because they did not comply with Rule 1:4-4(b). He considered Bruno's suspect expenditures "the most troubling" and "unexplained" of the allegations. Appellants did not support their "blanket statement" that investor funds spent on "dinners, outings, gentlemen's clubs, and the like" were for manufacturing supplies, equipment, or recruitment of Advisory Board members and additional capital. The ALJ observed "[t]here is no real dispute that Bruno used investor funds for other than Mirakill business." He also noted "[t]here are no descriptions of events where

9

Advisory Board members are recruited . . . [or] description of events where additional capital [was] sought. Nothing at all is said about the large amount of ATM withdrawals."

Furthermore, the ALJ found "Bruno and Mirakill failed to disclose this use of company funds to potential investors. The use of investor funds is a material fact and must be disclosed." Prior to investing in Mirakill, Marc Demyen, George Venizelos, Michael DiGiorgio, and Michael Baldino "were not apprised by Bruno that investor funds would be used for Bruno's personal benefit, expenses and entertainment. None of them would have invested in Mirakill had they been so apprised."

The ALJ further found the Mirakill interests were securities as expansively defined by N.J.S.A. 49:3-49(m) and unregistered securities in violation of N.J.S.A. 49:3-60 and that "Mirakill refer[red] to the Units as securities several times in both the PPM and the Agreement." Thus, appellants failed to demonstrate that the Mirakill interests were exempt under N.J.S.A. 49:3-50(b)(9):

> [Appellants] offer no evidence that they reasonably believed that all buyers are purchasing for investment. They have not established that there was no renumeration. In fact, Bruno received renumeration by his misuse of investor funds to pay personal expenses. Likewise, [appellants] have not offered any evidence

10

that the Mirakill securities were not offered or sold by general solicitation of any general advertisement.

[Appellants] have admitted that the Mirakill securities were not registered.

Additionally, Bruno acted as an unregistered "agent for Mirakill when he solicited investments from various individuals,' in violation of N.J.S.A. 49:3-56(a) and, in turn, that Mirakill employed Bruno as an unregistered agent in violation of N.J.S.A. 49:3-56(h).

Lastly, the ALJ found that Bruno "misrepresented the use of investor funds to at least five individuals[.]" He "sold, or solicited the sale of, securities to at least five individuals," in violation of the Security Law, which carries up to a $10,000 penalty for the first violation and up to a $20,000 penalty for each subsequent violation under N.J.S.A. 49:3-70.1.

Thus, the ALJ affirmed the Bureau Chief's May 23, 2018 summary order. Appellants filed written exceptions to the Initial Decision, contending the decision was flawed procedurally and substantively. The Bureau contended the exceptions were both substantively without merit and procedurally deficient under N.J.A.C. 1:1-18.4(b)(2), (3).

The Bureau Chief issued a September 24, 2019 final order adopting the ALJ's Initial Decision in its entirety. The Final Order: (1) ordered Mirakill and

Bruno to cease and desist from further violations of the Securities Law; (2) assessed a $100,000 civil monetary penalty against Mirakill and Bruno, jointly and severally; (3) denied Mirakill and Bruno any exemptions under N.J.S.A. 49:3-50(a)(9), (10), and (11) and N.J.S.A. 49:3-50(b); and (4) ordered that the exemption from registration requirements provided by N.J.S.A. 49:3-56(b), (c), and (g) be revoked as to Bruno and Mirakill.  This appeal followed.

Appellants raise the following points for our consideration:

> I.   THE ALJ ERRED IN GRANTING SUMMARY DECISION AND THE COMMISSIONER ACTED ARBITRARILY AND CAPRIC[I]OUSLY IN ADOPTING HIS FINDINGS THAT MIRAKILL'S OFFERING IS NOT EXEMPT FROM REGISTRATION PURSUANT TO N.J.S.A. 49:3-50(b)(9).

> II.   THE ALJ ERRED IN GRANTING SUMMARY DECISION AND THE COMMISSIONER ACTED ARBITRARILY AND CAPRIC[I]OUSLY IN ADOPTING HIS FINDINGS THAT [APPELLANTS] ARE NOT EXEMPT FROM REGISTRATION PURSUANT TO N.J.S.A. 49:3-56(b).

> III.   THE ALJ ERRED IN GRANTING SUMMARY DECISION AND THE COMMISSIONER ACTED ARBITRARILY AND CAPRIC[I]OUSLY IN ADOPTING HIS FINDINGS THAT THERE EXISTS NO GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER THE MIRAKILL LLC "MEMBERSHIP UNITS" CONSTITUTE SECURITIES.

12

IV. THE ALJ ERRED IN GRANTING SUMMARY DECISION AND THE COMMISSIONER ACTED ARBITRARILY AND CAPRIC[I]OUSLY IN ADOPTING HIS FINDINGS THAT THERE EXISTS NO GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER [APPELLANTS] MADE MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND/OR OMITTED MATERIAL FACTS IN THEIR OFFERING.

V. THE ALJ ERRED IN GRANTING SUMMARY DECISION AND THE COMMISSIONER ACTED ARBITRARILY AND CAPRIC[I]OUSLY IN ADOPTING HIS FINDINGS THAT THERE EXISTS NO GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER [APPELLANTS] MISUSED ANY INVESTOR FUNDS.

Appellate review of a final agency decision is limited. In re Carter, 191 N.J. 474, 482 (2007). We do not ordinarily overturn a final agency decision "in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence." Ibid. (quoting Campbell v. Dep't of Civ. Serv., 39 N.J. 556, 562 (1963)). In general, our role is limited to determining:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

13

[Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995) (citing Campbell, 39 N.J. at 562).]

Moreover, in reviewing final agency decisions, we "must defer to an agency's expertise and superior knowledge of a particular field." Carter, 191 N.J. at 483 (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). "[I]f substantial evidence supports the agency's decision, 'a court may not substitute its own judgment for the agency's even though the court might have reached a different result.'" Ibid. (quoting Greenwood, 127 N.J. at 513). However, we are not "bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Ibid. (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).

A party is entitled to summary decision where the motion record "show[s] that there is no genuine issue as to any material fact challenged and that the moving party is entitled to prevail as a matter of law." N.J.A.C. 1:1-12.5(b). Summary decision is appropriate "where the undisputed material facts . . . indicate that a particular disposition is required as a matter of law." In re Robros Recycling Corp., 226 N.J. Super. 343, 350 (App. Div. 1988). We review the grant of summary decision de novo. N.J. Div. of Tax'n v. Selective Ins. Co., 399 N.J. Super. 315, 322 (App. Div. 2008).

14

Applying these well-settled principles, we affirm substantially for the reasons expressed by the Bureau Chief in his May 23, 2018 summary order and the ALJ in his August 9, 2018 initial summary decision. We add the following comments.

The Securities Law makes it unlawful for any "security" to be offered or sold unless: (1) the security is registered under the Securities Law; (2) the security is a federally covered security; or (3) the security is exempt under the Securities Law. N.J.S.A. 49:3-60. The Securities Law defines the term "security" broadly; it includes any "certificate of interest," "transferable share, investment contract," or "warrant or right to subscribe to or purchase, any of the foregoing." N.J.S.A. 49:3-49(m).

The Securities Law's definition of security "unequivocally follow[s] the definition proffered by the Federal Securities Act of 1933." Manheim NJ Invs., Inc. v. Div. of Tax'n, 30 N.J. Tax 18, 34 (N.J. Tax Ct. 2017) (citing Conroy v. Schultz, 80 N.J. Super. 443, 450 (Ch. Div. 1963)). Indeed, the Securities Law's definition is "virtually identical" as that of 15 U.S.C. 77b(a)(1). AMR Realty Co. v. State, Bureau of Sec., 149 N.J. Super. 329, 334 (App. Div. 1977). We look to the United State Supreme Court for guidance. Manheim, 30 N.J. Tax at 34 (citing Conroy, 80 N.J. Super. at 451).

An investment contract is a security where there is "[(1)] an investment of money [(2)] in a common enterprise with [(3)] profits to come solely from the efforts of others." SEC v. W.J. Howey Co., 328 U.S. 293, 301 (1946). Our Supreme Court adopted this test in AMR Realty, 149 N.J. at 339.

A financial instrument meeting the definition of a security may be offered or sold without registration if exempt under the Securities Law. N.J.S.A. 49:3-60. "[T]he burden of proving an exemption or an exception from a definition is upon the person claiming it." N.J.S.A. 49:3-50(d).

Offers or sales of securities are exempt if sales are not made to more than ten people within twelve months, as long as "(i) the seller reasonably believes that all buyers are purchasing for investment, and (ii) no commission or other remuneration is paid or given directly or indirectly for soliciting any prospective buyer in this State, and (iii) the securities are not offered or sold by general solicitation or any general advertisement." N.J.S.A. 49:3-50(b)(9).

Appellants first argue a genuine issue of material fact existed as to whether the "units" they offered and sold are securities as defined by the Securities Law. Conceding the Mirakill units were neither registered in New Jersey nor federally covered, appellants contend the units met the exemption in N.J.S.A. 49:3-50(b)(9) because they only had nine investors, Bruno did not

16

receive renumeration from investor funds, and the units were not offered or sold by general solicitation.

The Mirakill units, however, are investment contracts as defined by the Securities Law and W.J. Howey. First, the Mirakill units were undoubtedly purchased with an expectation of profits; the PPM distributed to investors described the company's business model and expected earnings. Second, Mirakill is a common enterprise. Lastly, Mirakill's investors expected their profits to come solely from the efforts of Mirakill's leadership.

The Mirakill units were not exempt from registration. Mirakill has not produced any evidence that Bruno did not receive renumeration from his misuse of investor funds. In fact, appellants misconstrue their burden of disproving renumeration by stating "there is no evidence in the record to contradict that [Bruno] received no renumeration for the Mirakill offering." On the contrary, there is ample evidence that Bruno received renumeration.

Appellants further argue that Bruno was not required to be registered because he was a broker-dealer and met a fifteen-sales-or-less exemption. But N.J.S.A. 49:3-56(a) makes it unlawful for any person to act as an agent "unless that person is registered or exempt from registration" under the Securities Law.

Likewise, it is unlawful for "any broker-dealer or issuer to employ an agent . . . unless the agent is registered." N.J.S.A. 49:3-56(h).

The record demonstrates that Bruno served as Mirakill's exclusive agent. He met with potential investors as the "face" of Mirakill and solicited their investments. Although agent registration is not required under certain circumstances, none of those exemptions apply to this case.[1] Bruno served as an unregistered agent of Mirakill, in violation of N.J.S.A. 49:3-56(a), (h).

"Both Congress and our Legislature have chosen to protect investors by assuring that they [will] be given all materials necessary to make an informed decision." Rudbart v. N. Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 348 (1992). The Securities Law makes it unlawful

> for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly . . . (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make

---

[1] Agent registration is not required for: (1) sale of a security that is "issued or guaranteed by the United States, any state, [or] any political subdivision of a state," N.J.S.A. 49:3-50(a)(1); (2) any security issued or guaranteed by Canada, N.J.S.A. 49:3-50(a)(2); (3) "[a]ny security issued by and representing an interest in or a debt of, or guaranteed by, any bank, savings institution, or trust company," N.J.S.A. 49:3-50(a)(3); (4) "[a]ny investment contract issued in connection with" employee retirement or benefit plans under N.J.S.A. 49:3-50(11); (5) certain federally covered securities under N.J.S.A. 49:3-50(b); (6) sales made to employees, partners, or directors of the issuer; or (7) for transactions related to penny stocks. N.J.A.C. 13:47A-3.3(b).

A-0967-19

the statements made, in the light of the circumstances under which they are made, not misleading[.]

[N.J.S.A. 49:3-52(b).]

"[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." Basic Inc. v. Levinson, 485 U.S. 224, 240 (1988).

The Bureau argues the PPMs appellants distributed failed to inform potential investors that appellants planned to use investor funds to finance "trips to gentlemen's clubs or other personal expenses" and that such misrepresentations or omissions were material to the investors' decision to invest in Mirakill. Appellants argue all the sums spent at gentlemen clubs, outings, dinners, and the like were "for the recruitment of advisory board members and/or to attract additional investment capital." They contend these expenses constituted marketing expenses under the PPM.

These purported marketing expenses totaled $83,605.64, nearly sixty percent of the entire sum contributed by investors. In contrast, the $500,000 marketing estimate set forth in the PPM is only twenty percent of the projected estimated investments, $2,500,000. Surely, Mirakill investors would find a misstatement equating to a forty percent difference of allocated investor funds as "material." Appellants clearly violated N.J.S.A. 49:3-52(b).

A-0967-19

Appellant's remaining arguments are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

In sum, the record amply supports the Bureau Chief's and ALJ's factual findings.  Their legal conclusions are likewise fully supported by the record and consonant with applicable law.  We discern no basis to overturn any aspect of the Bureau Chief's final order.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0967-19