**In re ENRON CORP., et al., Debtors.**

**No. 01–16034 (AJG).**

United States Bankruptcy Court, S.D. New York.

Oct. 28, 2002.

---

Weil, Gotshal & Manges, LLP, New York City, Martin J. Bienenstock, Martin

A. Sosland, Timothy E. Hoeffner, of counsel, for Debtors.

Milbank, Tweed, Hadley & McCloy, LLP, New York City, Matthew S. Barr, of counsel, for Official Committee of Unsecured Creditors.

Fiddler, Gonzalez & Rodriguez, LLP, San Juan, PR, Brian K. Tester, of counsel, for Banco Bilbao Vizcaya Argentaria Puerto Rico.

*MEMORANDUM DECISION AND ORDER DENYING BANCO BILBAO VIZCAYA ARGENTARIA PUERTO RICO'S MOTION TO CHANGE VENUE OF SAN JUAN GAS COMPANY, INC.*

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Upon consideration of the: (i) Motion for Change of Venue brought by Banco Bilbao Vizcaya Argentaria Puerto Rico ("BBV" or "Movant") dated July 11, 2002 (the "Motion" or "Change of Venue Motion") (Docket Entry # 5352); (ii) Debtors' Memorandum of Law in Opposition ("Respondent") to Banco Bilbao Vizcaya Argentaria Puerto Rico Motion for Transfer of Venue of San Juan Gas Company Inc. Chapter 11 Case to the District of Puerto Rico dated August 26, 2002 (the "Memorandum in Opposition") (Docket Entry # 6081); and (iii) Affidavit of Stephen Dowd in Opposition to Banco Bilbao Vizcaya Argentaria Puerto Rico Motion for Transfer of Venue of San Juan Gas Company Inc. Chapter 11 Case to the District of Puerto Rico entered on August 26, 2002 (the "Dowd Affidavit") (Docket Entry # 6084); and the record of the hearing held on August 29, 2002;[1] and for the reasons set forth below, this Court denies

---

1. The Creditors' Committee appeared at the August 29, 2002 hearing and entered oral opposition to the Change of Venue Motion.

(Transcript of August 29, 2002 Change of Venue Motion Hearing at 264 line 7 to line 10.)

the Motion to transfer venue of this bankruptcy case from the Southern District of New York to the District of Puerto Rico, pursuant to 28 U.S.C. § 1412.

## I. Background[2]

### A. Enron Corp. Debtors

On December 2, 2001, Enron Corp. and certain of its affiliated entities ("Enron Corp. Debtors") commenced cases under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code" or "Code").

As of the petition date, Enron Corp. was a large, multifaceted national and international corporation with operations, financial interests, creditors and stockholders across the United States and around the world. *In re Enron Corp.*, 274 B.R. 327, 334 (Bankr.S.D.N.Y.2002). Enron Corp., an Oregon corporation, is a holding company of subsidiaries engaged in the wholesale and commodity market business, telecommunications and insurance. *Id.* Enron Corp. Debtors divide their business operations into five primary business units: Enron Wholesale Services, Enron Retail Services, Enron Transportation Services, Enron Global Services and Enron Broadband Services. *Id.* The Enron Corp. Debtors have approximately 3,500 direct and indirect subsidiaries (all Enron Corp. affiliated debtors and subsidiaries to file for Chapter 11 up to this point, with the exception of San Juan Gas Company, Inc., are hereinafter referred to as the "Enron Debtors"). *Id.*

### B. San Juan Gas Company, Inc.

San Juan Gas Company, Inc. ("SJG" and, together with the Enron Debtors, the "Debtors"), a wholly-owned direct subsidiary of Enron Corp., commenced a case under Chapter 11 of the Bankruptcy Code on June 12, 2002 (Case Number 02–12902). 1007–2 Affidavit ¶ 8 (hereinafter "1007–2 Aff."[3]). SJG has no publicly held shares of stock, debentures, or other securities. 1007–2 Affidavit ¶ 8.

SJG conducts operations on the island of Puerto Rico where it is the sole distributor of propane gas for San Juan. 1007–2 Aff. ¶ 18. Pursuant to local statute, SJG has a monopoly on gas distribution to the San Juan area.[4] However, SJG cannot alter its

---

**2.** Additional relevant history of the Enron Corp. Debtors is more fully set forth in this Court's Memorandum Decision dated January 11, 2002 (Docket Entry # 870), wherein the Court denied several motions to transfer venue. That decision is reported at *In re Enron Corp.*, 274 B.R. 327 (Bankr.S.D.N.Y.2002).

**3.** Pursuant to local bankruptcy rule 1007–2, Chapter 11 debtors must file an affidavit setting forth, *inter alia,* the nature of debtor's business and a concise statement of the circumstances leading to the debtor's filing. The affidavit pursuant to 1007–2 must accompany a voluntary Chapter 11 petition. LBR 1007–2(c).

**4.** As set forth in SJG's July 15, 2002 Motion for Operating Funds ¶ 5 (see *infra.* p. 382):

SJG is the only company authorized by the Puerto Rico Public Service Commission (the "PRPSC") to install and operate a gas distribution pipeline systems on the island.

As a jurisdictional monopoly governed by the PRPSC, SJG is obligated to provide gas service to its customers, and it cannot unilaterally modify its service obligation (i.e., it must obtain PRPSC approval prior to abandoning or diminishing services). The PRPSC has indicated it will not allow SJG to abandon service, and it is statutorily authorized to impose both civil and criminal sanctions to ensure continuity of service. In addition, the Puerto Rico statute provides that violation of the statute is a misdemeanor, and it gives the PRPSC a statutory right to fine SJG if it "violates any provision of the regulations governing the carrying of gas through pipelines" for a maximum amount of $1,000 per day that the violation persists, with a total maximum penalty of $200,000 for any series of violations. In sum, the service obligation requires SJG to continue performing, regardless of financial condition, or risk the imposition of severe sanctions.

level of service absent pre-approval from appropriate local regulatory agencies. Without regulatory pre-approval, should SJG fail to provide continuous gas service at specified levels, SJG could incur civil and criminal sanctions. Further, Enron Corp. as parent corporation of SJG could be exposed to liability from SJG's actions. *See* Motion for SJG Operating Funds ¶ 16 (see *infra.* p. 382).

SJG states that "[w]ith almost no cash reserves and a mandatory service obligation, SJG found itself in a situation where commencing its chapter 11 case was the only alternative." Motion for SJG Operating Funds ¶ 6 (see *infra.* p. 382). The causes underlying this condition are both external and internal to SJG.[5] First, SJG cites internal cutbacks that have lead to a decrease in its customer base. Second, SJG notes that it took on a debt burden due to an unsuccessful attempt at developing a fiber optic network in conjunction with another Enron affiliate, Enron Broadband Services. Third, due to regulatory and market restrictions, SJG has been unable to raise its customer's rates. Fourth, outstanding receivables are unlikely to be collected in the near future. Fifth, SJG

has had to incur substantial expenses due to regulatory compliance issues.

Although not cited by SJG, this Court notes that SJG and certain Enron Debtors are defendants in a lawsuit pending before the United States District Court for the District of Puerto Rico concerning a gas pipeline explosion that took the lives of thirty (30) people; injured scores of others; and resulted in extensive damage to property. *See* Motion Requesting Partial Relief from the Automatic Stay ¶ 1 filed December 27, 2001 (Docket Entry # 481); Transcript of August 29, 2002 Change of Venue Motion Hearing at 252 line 20 to line 24; 263 line 10 to line 17; 264 line 19 to 265 line 6; (hereinafter "Tr."). In fact, six (6) months prior to SJG's Chapter 11 filing, plaintiffs in the case pending before the District Court of Puerto Rico filed a motion before this Court seeking relief from the automatic stay in order to pursue the litigation in the District Court of Puerto Rico. Pursuant to an Agreed Order of this Court dated April 11, 2002 (Docket Entry # 2933), relief from stay was denied, and Debtors were permitted to settle

---

**5.** The reasons set forth in SJG's 1007–2 Aff. ¶ 20, are:

> Its current cash flow situation is negative and is a result of many factors including: the continued decrease in customer base and volumes, the additional debt burden resulting from the aborted development of a fiber optic network with Enron Broadband Services in 2000, and the regulatory and market restrictions on customer rate increases. Without funding from Enron Corp., SJG's parent, this entity has no ability to fund its business activities. SJG has filed a chapter 11 petition in order to protect the San Juan Gas assets.

SJG elaborates on these reasons in the Motion for SJG Operating Funds ¶ 6 (see *infra.* p. 382):

> SJG's cash flow recently has been negative, and it is anticipated that it will continue to be so for the foreseeable future, SJG's rate

structure, set by the PRPSC, has not been realigned since 1985, and it is uncertain when an application for a new rate case will be made or approved. In the interim, SJG has realigned its business to serve fewer larger commercial customers. As a result, the current rate structure is insufficient to cover expenses. Current cash flow projections show that SJG will run out of cash by the middle of September 2002. SJG believes that it can collect on certain receivables owed to it, but the timing of such collection could extend until after SJG's need for financing. These receivables, along with others, have been outstanding for a few years and an organized collection effort has been ongoing since the summer of 2001. In addition, SJG is currently expending amounts up to a budgeted $300,000 in connection with various OSHA, DOT and EPA regulations.

with plaintiffs without further order of this Court.

Approximately one (1) month after SJG filed for Chapter 11, and approximately eight (8) months after Enron Corp. filed for Chapter 11, on July 11, 2002, Banco Bilbao Vizcaya Argentaria Puerto Rico ("BBV"), a general unsecured creditor of SJG (and Enron Corp.), brought the instant motion pursuant to 28 U.S.C. § 1412 seeking a change of venue for SJG's bankruptcy case from the Southern District of New York to the District of Puerto Rico.

At about the same time, due to an ongoing negative cash flow, and its obligations to provide uninterrupted service of gas, SJG sought approval from this Court to borrow operating funds in the amount $495,000 from Enron Corp. On July 15, 2002, Enron Corp. and SJG brought a Motion for (A) An Order Approving Enron Corp.'s Use of Property Outside the Ordinary Course of Business and Use of Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361 and 363 and Fed. R. Bankr.P. 4001(b) and 6004 and (B) Entry of Order, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364, Authorizing San Juan Gas Company, Inc. to Enter Into Post-petition Financing Agreement With Enron Corp. and Granting Liens and Super–Priority Claims (the "Motion for SJG Operating Funds") (Docket Entry # 5135). By Order of this Court dated August 12, 2002, Debtors' Motion for SJG Operating Funds was granted (the "Final Order") (Docket Entry # 5744). The cash infusion appears to have been calculated to stem the cash flow problems and to temporarily ameliorate the underlying causes of SJG's faltering business plan.

On August 29, 2002, this Court held a hearing on the instant Change of Venue Motion. In support of its opposition, Debtors submitted the affidavit of Stephen Dowd, Director of Enron Global Assets and Services ("Dowd"). Dowd was available for cross-examination at the hearing; however, Movant did not examine the affiant, and thus his testimony stands uncontroverted. This Court has considered Movant's arguments in favor of transferring the venue of SJG's bankruptcy case, and the opposition thereto, and concludes that transfer is not warranted.

## II. Facts of SJG's Bankruptcy Case
### A. SJG's Business and Assets

As explained above, SJG is a direct subsidiary of Enron Corp. and is a provider of propane gas to customers in and around the San Juan, Puerto Rico area. SJG is,

the local gas distribution company serving the San Juan metropolitan and Old San Juan area through an underground gas (propane air mixture) distribution system. Established in 1911 and acquired in 1985 the company is the only one of its type authorized by the government of Puerto Rico's Public Service Commission to install pipeline systems in the Island. The current active system includes approximately 23.5 miles of pipeline, which sells Propane to 408 commercial customers (primarily Puerto Rico's tourism industry). A project including a fiber optic network ring and an expansion of the pipeline system to 37 miles is 90% complete but has been suspended. The company also owns storage facilities that include 60,000 gallons of LPG (liquid) storage and 500,000 cubic feet of Propane/Air mix storage capacity.

1007–2 Aff. ¶ 18.

### B. SJG's Financial Relationship With BBV

On August 10, 2001, BBV and SJG entered into a 364–Day Revolving Credit Agreement dated August 10, 2001 (the "Credit Agreement"), and a Guaranty

Agreement dated August 10, 2001 was made by Enron Corp. Dowd Aff. ¶ 11. Both agreements are governed by New York law, and provide that notice to BBV shall also be provided to its offices in New York, New York. Dowd Aff. ¶ 11. The Proof of Claim filed BBV on February 5, 2002 in the main Enron case states that it intends to hold Enron and SJG "jointly and severally indebted to [BBV] in the principal amount of $14,400,000, plus accrued interest thereon, costs, fees and other expenses."

### C. Enron as "DIP Lender"

Pursuant to the Final Order granting the Motion for SJG Operating Funds, SJG received a debtor-in-possession loan ("DIP Loan") from Enron Corp. for $495,000. The funds were requested because there was an "immediate and critical need … for SJG to obtain funds in order to continue the operation of its business and prepare for a sale of its assets. Without such funds, SJG [would not] be able to maintain its mandatory service obligations, meet payroll, pay its direct operating expenses, and obtain goods and services needed to carry on its business … in [order to] avoid irreperable harm to SJG's estate." Motion for SJG Operating Funds ¶ H. Thus, Enron Corp. became DIP lender to its subsidiary SJG.

### D. SJG's Management

Enron Corp. representatives play a key role in the management of SJG. Dowd Aff. ¶ 5. All strategic decisions for SJG are made by a management team located in Houston, Texas. Dowd Aff. ¶ 5.

### E. SJG's Financial Books and Records

SJG's financial books and records are maintained in duplicate, with copies kept in San Juan and Houston. Dowd Aff. ¶ 6. Despite having a controller employed in San Juan, the review and reconciliation of SJG's financial books and records is conducted by a Houston based accounting staff. Dowd Aff. ¶ 6. Further, the Houston accounting staff has final review and sign-off on SJG's financial statements and reports. Dowd Aff. ¶ 6. Houston management oversees and approves the development of annual budgets and business projections. Dowd Aff. ¶ 6.

In order to ensure compliance with the Cash Management Order, all expenditures are approved by the Enron Cash Committee, the members of which are located in Houston. Dowd Aff. ¶ 6. Most of SJG's bank accounts are controlled by Houston personnel. Dowd Aff. ¶ 6. Local disbursements are made only after the Enron Cash Committee releases funds into local accounts from the Houston-controlled accounts. Dowd Aff. ¶ 6.

SJG's business insurance requirements are met through Enron corporate policies and supplemented by policies procured through a San Juan insurance agency that is supervised by Houston risk management professionals. Dowd Aff. ¶ 6.

### F. SJG's Human Resources

Enron management in Houston makes all major human resource decisions. Dowd Aff. ¶ 7. This includes benefit programs, key employment decisions and retention and bonus programs. Dowd Aff. ¶ 7. Annual performance reviews for senior SJG employees are conducted by Enron management in Houston, and the size of the annual bonus pool, if any, and its disbursement are determined in Houston. Dowd Aff. ¶ 7. Labor contract negotiations with local labor unions are conducted by Houston-based human resource personnel. Dowd Aff. ¶ 7.

### G. Professionals

In light of the pending case involving SJG's parent company, Enron Corp., the professionals who will participate in SJG's Chapter 11 case are also located in New York. Dowd Aff. ¶ 8, 9. The majority of

professionals retained in SJG's Chapter 11 case are located in New York, including: (i) Weil, Gotshal & Manges LLP, the attorneys for the Enron Debtors and SJG; (ii) The Blackstone Group L.P., financial advisors for the Enron Debtors and SJG; (iii) Milbank, Tweed, Hadley & McCloy, the attorneys for the Creditors' Committee; (iv) Houlihan, Lokey, Howard & Zukin, the financial advisors for the Creditors' Committee; and (v) Bankruptcy Services LLC, the claims agent for the Enron Debtors and SJG. Dowd Aff. ¶ 8, 9.

### H. Creditors' Committee

Debtors' statutory creditors' committee (the "Committee") is comprised of fourteen (14) members, six (6) of whom are located in New York, three (3) are located in Texas. Dowd Aff. ¶ 8. The Creditors' Committee opposes the transfer of venue motion. Dowd Aff. ¶ 8.

### I. Sale of SJG's Assets

The Houston management team of SJG has primary responsibility for conducting the sale of SJG's assets. Dowd Aff. ¶ 5. SJG intends to sell its assets in an auction. Dowd Aff. ¶ 10. During that process, the vast majority of negotiations concerning financing and sale of the assets will take place among the legal and financial advisors retained in SJG's Chapter 11 case, most of whom are located in New York. Dowd Aff. ¶ 10. As of August 23, 2002, SJG has signed confidentiality agreements with nineteen parties. Dowd Aff. ¶ 10. Of those parties identified as interested in possibly purchasing SJG's assets ten (10) are located or have offices in New York or have easy access to New York and nine (9) are located in Puerto Rico. Dowd Aff. ¶ 10.

### J. BBV

BBV, an unsecured creditor of SJG, has offices in New York, and representatives of BBV in New York have participated in discussions with the Debtors regarding the status of SJG's pre-petition unsecured loan and provided contacts to Enron potentially interested in buying SJG's assets. Dowd Aff. ¶ 11. On February 5, 2002, BBV filed a proof of claim in this Court claiming Enron Corp. owes it $14,400,000 pursuant to the Credit Agreement. Dowd Aff. ¶ 11.

### K. Accessibility of New York

New York City is a world financial center. *In re Enron Corp.*, 274 B.R. 327, 349 (Bankr.S.D.N.Y.2002). It is also easily accessible with three major airports, and two major rail stations in its immediate vicinity. *Id.* at 339. It is one of the world's most accessible locations. *Id.*

### III. Discussion

Movant's Change of Venue Motion is the second time this Court has been called upon to consider the appropriateness of venue as it relates to one or more of Debtors' cases. This Court's Memorandum Decision dated January 11, 2002 (hereinafter "Decision Denying Change of Venue") (Docket Entry # 870) (reported at *In re Enron Corp.*, 274 B.R. 327 (Bankr. S.D.N.Y.2002)) denied a transfer of venue motion brought by movants who were seeking to change venue of the Enron Corp. Debtors case from the Southern District of New York to the Southern District of Texas (the "First Change of Venue Motion"). In that decision, this Court found that movants had failed to establish by a preponderance of evidence that transfer of venue was in the interest of justice or for the convenience of the parties.

The First Change of Venue Motion dealt with a different set of considerations from the ones posed by BBV. The main difference highlighted by BBV is that the First Change of Venue Motion sought to transfer the entire Enron Corp. bankruptcy case to another district, while the instant motion seeks to transfer the bankruptcy case of only one (1) debtor subsidiary of Enron Corp. *See* Change of Venue Motion

at 5. Movant's Change of Venue Motion challenges venue based on what is essentially a theory of "overcentralization." However, if Movant's request is granted, the result would fragment Debtors' cases to the detriment of their creditors, including SJG's creditors.

### A. Standard for Granting the Requested Relief

Section 1408 of title 28 of the United States Code governs venue in Chapter 11 cases. Section 1408 provides that a case under title 11 may be commenced in the district court for the district—

> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or
>
> (2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

28 U.S.C. § 1408.

■ Under § 1408(1), a prospective debtor may select the venue for its Chap-

ter 11 reorganization. *In re Enron Corp.,* 274 B.R. 327, 341 (Bankr.S.D.N.Y.2002). Specifically, venue is proper in any jurisdiction where the debtor maintains a domicile, residence, principal place of business or where its principal assets are located for at least 180 days before the filing of the bankruptcy petition. *Id.* Pursuant to 28 U.S.C. § 1408(2), venue is also proper for any affiliate [6] that files a bankruptcy petition within a venue where there is already a bankruptcy case pending under § 1408(1). *Id.*

Movant does not dispute that the Enron Debtors and SJG are properly venued in the Southern District of New York pursuant to 28 U.S.C. § 1408. *See* Change of Venue Motion at 2. Rather, Movant's argument is that although venue is proper in the Southern District of New York, SJG's case may nevertheless be transferred pursuant to 28 U.S.C. § 1412 which provides that:

> A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

*See also* Fed. R. Bankr.P. 1014(a)(1).[7]

■ Section 1412 authorizes the transfer of cases from one district to another

---

6. Section 101(2) of title 11 of the United States Code defines affiliate to include:

> (A) [an] entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, ... [or]
> (B) [a] corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor....

11 U.S.C. § 101(2).

7. Fed. R. Bankr.P. 1014 provides:

> (a) Dismissal and Transfer of Cases.
> (1) Cases Filed in Proper District. If a petition is filed in a proper district, on timely motion of a party in interest, and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, the case may be transferred to any other district if the court determines that the transfer is in the interest of justice or for the convenience of parties.

either in the "interest of justice" or "for the convenience of the parties." These phrases each give authority independent of the other. *In re Portjeff Dev. Corp.*, 118 B.R. 184, 193 (Bankr.E.D.N.Y.1990). Under the Bankruptcy Act, both requirements had to be met. *Id.* The transfer had to be both in the interest of justice and for the convenience of the parties. *Id.* It is true that generally what serves the convenience of the parties will also serve the interest of justice, but the contrary is not necessarily true. *Id.*

■ The bankruptcy court's authority to exercise the district court's power to transfer a case under 28 U.S.C. § 1412 stems from the district court's referral of the case to the bankruptcy court pursuant to 28 U.S.C. § 157(a). *Enron*, 274 B.R. at 342, *citing In re Waits*, 70 B.R. 591, 594 (Bankr.S.D.N.Y.1987); *In re Oceanquest*, 56 B.R. 715, 718–19 (Bankr.D.Conn.1986). A motion to transfer venue is a core matter, as it concerns the administration of the estate. *Enron*, 274 at 342, *citing Waits*, 70 B.R. at 594; *Oceanquest*, 56 B.R. at 718–19.

■ The burden is on the movant to show by a preponderance of the evidence that the transfer of venue is warranted. *Enron*, 274 B.R. at 342, *citing Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1390 (2d Cir.1990); *Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1241 (5th Cir.1979) (hereinafter "*CORCO*"); *In re Eclair Bakery Ltd.*, 255 B.R. 121, 141 (Bankr.S.D.N.Y.2000); *Huntington Nat'l Bank v. Industrial Pollution Control, Inc. (In re Industrial Pollution Control, Inc.)*, 137 B.R. 176, 180 (Bankr.W.D.Pa.1992); *In re Suzanne de*

*Lyon, Inc.*, 125 B.R. 863, 868 (Bankr. S.D.N.Y.1991); *In re Garden Manor Assoc., L.P.*, 99 B.R. 551, 553 (Bankr. S.D.N.Y.1988). The decision of whether to transfer venue is within the court's discretion based on an individualized case-by-case analysis of convenience and fairness. *Enron*, 274 B.R. at 342, *citing Manville*, 896 F.2d at 1391 (analogizing adjudication under 28 U.S.C. § 1404 and citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)); *CORCO*, 596 F.2d at 1247; *Eclair Bakery Ltd.*, 255 B.R. at 141; *In re Seton Chase Assoc., Inc.*, 141 B.R. 2, 5 (Bankr.E.D.N.Y.1992); *In re Vienna Park Properties*, 125 B.R. 84, 87 (S.D.N.Y.1991); *Garden Manor*, 99 B.R. at 553.

■ Transferring venue of a bankruptcy case is not to be taken lightly. *Enron*, 274 B.R. at 342, *citing CORCO*, 596 F.2d at 1241 (explaining that "the court should exercise its power to transfer cautiously") (citation omitted); *In re Pavilion Place Assocs.*, 88 B.R. 32, 35 (Bankr.S.D.N.Y. 1988) (explaining that "[t]ransfer is a cumbersome disruption of the Chapter 11 process.") (citations omitted).

■ A debtor's choice of forum is entitled to great weight if, as in SJG's case, venue is proper. *Enron*, 274 B.R. at 342, *citing In re Ocean Properties of Delaware, Inc.*, 95 B.R. 304, 305 (Bankr.D.Del.1988); *In re Windtech*, 73 B.R. 448 (Bankr. D.Conn.1987). This is so because "[w]here a transfer would merely shift the inconvenience from one party to the other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed." *Enron*, 274 B.R. at 343, *citing Garden Manor*, 99 B.R. at 555 (citing 1 James Wm. Moore et al., *Moore's Federal Practice* ¶ 56.10 (2d

Fed. R. Bankr.P. 1014.

ed.1988)); *In re Great American Resources, Inc.*, 85 B.R. 444 (Bankr.N.D.Ohio 1988) ("venue decisions should not merely shift the inconvenience from one party to another") (citations omitted). The decision to transfer requires an examination of a broad array of factors, and a bankruptcy court's decision denying or transferring venue will only be reversed if the court's decision constitutes an abuse of discretion. *In re S.O.S. Sheet Metal Co.*, 297 F.2d 32 (2d Cir.1961); *see also Enron*, 274 B.R. at 343, *citing Manville*, 896 F.2d at 1391; *CORCO*, 596 F.2d at 1247; *Vienna Park*, 125 B.R. at 87.

■ Pursuant to 28 U.S.C. § 1412, the Court must grant relief if it is established that a transfer of venue would be proper if it is in (1) the interest of justice or (2) the convenience of the parties. *Enron*, 274 B.R. at 343. In considering the convenience of the parties, the Court weighs a number of factors:

1. The proximity of creditors of every kind to the Court;

2. The proximity of the debtor to the Court;

3. The proximity of the witnesses necessary to the administration of the estate;

4. The location of the assets;

5. The economic administration of the estate;[8] and

6. The necessity for ancillary administration if liquidation should result.[9]

*Enron*, 274 B.R. at 343, *citing CORCO*, 596 F.2d at 1247.

■ The factor given the most weight is the promotion of the economic and efficient administration of the estate. *Enron*, 274 B.R. at 343, *citing CORCO*, 596 F.2d at 1247.

■ When considering the "interest of justice," the court applies a broad and flexible standard. *Enron*, 274 B.R. at 343, *citing Manville*, 896 F.2d at 1391. The court considers whether transfer of venue will promote the efficient administration of the estate, judicial economy, timeliness, and fairness. *Enron*, 274 B.R. at 343, *citing Manville*, 896 F.2d at 1391.

This Court is guided by numerous cases examining whether to transfer venue pursuant to 28 U.S.C. § 1412.[10]

---

8. Most courts address this factor in terms of both the "economic" and "efficient" administration of the estate. *Enron*, 274 B.R. at 343, *citing CORCO*, 596 F.2d at 1247 ("most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate").

9. As explained in this Court's decision, *Enron*, 274 B.R. at 343, this factor is often discounted by the courts. *See CORCO*, 596 F.2d at 1248 ("anticipation of the failure of the Chapter XI proceeding is an illogical basis upon which to predicate transfer") (citation omitted); *In re Suzanne de Lyon, Inc.*, 125 B.R. 863 (Bankr.S.D.N.Y.1991) ("structuring the Chapter 11 proceeding with the anticipation of its failure is inconsistent with its rehabilitative purpose, and should not form the basis for transfer of venue").

10. As explained in this Court's decision, *Enron*, 274 B.R. at 343, the Second Circuit has not addressed the transfer of a bankruptcy case pursuant to 28 U.S.C. § 1412. *Enron*, 274 B.R. at 343. Although there is no Second Circuit authority directly addressing the transfer of a bankruptcy case in its entirety, this Court finds instructive the Second Circuit's decision in *Manville* addressing the transfer of an adversary proceeding within a bankruptcy case. *See Enron*, 274 B.R. at 343 *citing Manville*, 896 F.2d 1384; *In re Shorts Auto Parts*, 136 B.R. 30, 35 (Bankr.N.D.N.Y. 1991) (addressing the *Manville* decision in considering whether transfer of the bankruptcy case as a whole was appropriate).

The Second Circuit in *Manville* did not specifically reference the decision by the Fifth Circuit in *CORCO*. *Enron*, 274 B.R. at 343. However, similar factors were applied. *Id.* The Second Circuit in *Manville* affirmed the

### i. CORCO Factors Examined

The seminal circuit court case on the issue of whether to transfer venue of a bankruptcy case under 28 U.S.C. § 1412 and Federal Rule of Bankruptcy Procedure 1014 is *CORCO*.[11] In *CORCO*, the Fifth Circuit examined whether to transfer venue to Puerto Rico of an oil refining company debtor and eleven subsidiaries that filed a Chapter XI petition for reorganization in San Antonio, Texas. *Enron*, 274 B.R. at 344. The Fifth Circuit concluded that the bankruptcy court did not abuse its discretion in retaining the bankruptcy case. *Id.*

In examining the factors delineated by the bankruptcy court, the Fifth Circuit determined that the proximity of creditors (and stockholders) favored San Antonio; that the location of management and witnesses weighed in favor of San Antonio, but that the Debtor's assets and original books and records were in Puerto Rico. *Id.* The court placed little emphasis on the location of the assets and discounted the consideration concerning ancillary administration. Id.

The Fifth Circuit also addressed the "interest of justice" prong of § 1412. *Id.* In so considering, the court retained venue in the location best suited to solve the financial problems of the debtor and to be the least disruptive to the operations of the debtor. *Enron*, 274 B.R. at 344.

The Fifth Circuit's decision in *CORCO* is cited in virtually every opinion this Court reviewed concerning the transfer of a bankruptcy case under § 1412. *Id.* There appears to be no dispute that the factors set forth in the *CORCO* decision are to be considered by this Court. *Id.*

### ii. Fairfield Puerto Rico Examined

The factors set forth in *CORCO* are persuasive. Before the Bankruptcy Code of 1978 was passed, the factors set forth in *CORCO* were used by courts in this circuit and others to determine venue issues. *See In re Hudik–Ross Co., Inc.*, 198 F.Supp. 695 (S.D.N.Y.1961), *aff'd per curiam sub nom. In re S.O.S. Sheet Metal Co.*, 297 F.2d 32 (2d Cir.1961); *Hawaiian Investors v. Thorndal*, 339 F.2d 807, 809 (8th Cir. 1965); *In re Triton Chem. Corp.*, 46 F.Supp. 326, 329 (D.Del.1942); *generally In re United Button Co.*, 137 F. 668 (D.Del.1904). Thus, there is a broad range of persuasive precedent.

In its decision, the *CORCO* court cited *In re Fairfield Puerto Rico, Inc.*, 333 F.Supp. 1187 (D.Del.1971), a case decided under the Bankruptcy Act.[12] In *Fairfield*, the Delaware District Court denied two (2) separate motions to transfer venue. *Id.* The motions were considered by the court together: the first motion sought transfer from Delaware to the Northern District of Ohio; and the second sought transfer to the District of Puerto Rico. *Id.*

district court's balancing of factors, such as the fact that the bankruptcy court had developed a substantial learning curve, as well as the court's considerations under the interest of justice component of judicial economy, timeliness and fairness. *Enron*, 274 B.R. at 343, *citing Manville*, 896 F.2d 1384.

11. Although the *CORCO* opinion was decided in 1979 under the former Bankruptcy Act and Federal Rule of Bankruptcy Procedure 116(b)(1), courts continue to apply the same analysis pursuant to current 28 U.S.C. § 1412

(effective July 10, 1984) and Federal Rule of Bankruptcy Procedure 1014. *See* Collier on Bankruptcy, ¶ 1014.02[2][a], 1014–4 (15th ed. rev.2001).

12. Although *Fairfield* pre-dates *CORCO*, it applies the same factors as set forth in *CORCO*. Further, *Fairfield* was decided under the venue provisions of Bankruptcy Act § 32. Section 1412 traces its genesis to Bankruptcy Act § 32. *See* explanation *supra* note 11.

The *Fairfield* case involved Fairfield Puerto Rico, Inc., a Delaware corporation and a wholly-owned subsidiary of Fairfield that had contracted with the Municipality of San Juan, Puerto Rico for the construction and operation of a composting plant for processing of refuse for the Municipality of San Juan. *Fairfield* at 1189. Although the plant became operational, it eventually had to curtail operations because it was unable to receive regulatory approval to market the fertilizer that the plant was designed to render. *Id.* Tons of unprocessed refuse piled up until the municipality of San Juan pursued its right under the default provisions of the contract. *Id.*

In weighing the parties' positions on the transfer of venue motions, the court evaluated the arguments utilizing the factors that were subsequently set forth in *CORCO*. *Id.* The court determined that "the overwhelming number of all creditors are from San Juan, Puerto Rico, while the amount owed creditors is by a similar overwhelming percentage from the Northern District of Ohio." *Fairfield* at 1191. The court observed that the "principal office, payroll, accounts receivable and accounts payable ledgers are in San Juan while all other books, principal records and officers are in the Northern District of Ohio with the exception of one." *Id.* The court stated that "[m]ost, if not all, of the physical assets of the debtor-in-possession, valued at over Two Million Dollars, are located in San Juan." *Id.* Further, the court reasoned that the elusive regulatory approval for the plant's operation was essential to the bankruptcy proceeding's success and could only be dealt with outside of San Juan. *Id.* Finally, the court addressed the issue of whether the reorganization proceeding might fail and stated that "[a]nticipation of the failure of the ... proceeding is an illogical basis upon which to predicate a transfer." *Id.*

After weighing the above factors, and concluding that the transfer of venue motions should be denied, the court concluded that, aside from the plant's operational status, the other key consideration in denying the motions was that the debtor's success depended "primarily on efforts and activities which are centered in the eastern part of the United States." *Id.* The *Fairfield* court was confronted with a debtor that had virtually all of its assets, creditors, and operations based in San Juan but nonetheless denied transfer of venue to that district. *Fairfield* at 1191. The *Fairfield* court's reasoning can be best characterized as a practical approach. This Court finds the *Fairfield* court's reasoning applicable here, and thus analyzes Movant's § 1412 motion in the context of the practical realities of Respondent's case.

### B. Movant's Argument Does Not Persuade This Court

In support of its motion, Movant urges an analysis of the *CORCO* factors that this Court finds unpersuasive.

First, as to the issue of "convenience of the parties," Movant states that the motion should be granted because Puerto Rico is the situs of SJG's nerve center; creditors; witnesses; assets; and projects. Further, in the event of liquidation, such liquidation would occur in Puerto Rico.

Second, as for the "interest of justice," Movant argues that because SJG's assets will likely be sold, the case should be transferred because Puerto Rico is the situs of SJG's assets; creditors; operations; and where "more than likely the potential and eventual purchaser" is located.

Respondent concedes that it intends to sell SJG's assets in an auction. Memorandum in Opposition ¶ 36. However, for the reasons set forth herein, Movant has failed to establish by a preponderance of evidence that transfer of venue is in the

interest of justice or for the convenience of the parties.

 In the context of SJG's case, the factors considered cannot be viewed in an insular manner. *See Enron*, 274 B.R. at 345. Rather, the standards must be applied with a broader perspective, taking into account the national and international scope of the Enron Debtors, *Id.*, and SJG. Moreover, the standards must be applied considering the realities of the administration of a complex Chapter 11 debtor, even if the reorganization effort is with the objective of developing a liquidating Chapter 11 plan. *See Id.* In addressing the convenience of the parties and the interest of justice, this Court will examine the *CORCO* factors as well as the learning curve issue, while taking into consideration the efficient administration of the bankruptcy estate and matters of judicial economy, timeliness and fairness based upon the unique facts and circumstances of SJG's and the Enron Debtors' complex corporate structure—with the outcome of its bankruptcy reorganization having worldwide implications. *See Enron*, 274 B.R. at 345 *citing Manville*, 896 F.2d at 1391 (citations omitted). A flexible approach is necessary because "venue does not easily submit to hard and fast rules." *In re Abacus Broad., Corp.*, 154 B.R. 682 (Bankr. W.D.Tex.1993).

### C. Analysis

 As set forth above, it is this Court's view that an analysis of a motion for the transfer of venue under 28 U.S.C. § 1412 should employ the factors set forth in *CORCO.*

### i. Convenience of the Parties

The first consideration pursuant to § 1412 involves an analysis of the "convenience of the parties."

### a. The Location of the Assets

The asset at issue is SJG's gas pipeline in and around San Juan covering approximately thirty-seven (37) miles, and appurtenant gas storage facilities. The operation of the pipeline is subject to a regulatory contract under which SJG is purportedly unprofitable. The pipeline is expected to be sold in order to fund SJG's Chapter 11 liquidating plan.

 The location of the assets is not as important when the ultimate goal of the bankruptcy case is rehabilitation rather than liquidation. *CORCO*, 596 F.2d at 1248; *In re Island Club Marina, Ltd.*, 26 B.R. 505, 508 (Bankr.N.D.Ill.1983) (holding that "this factor is not controlling in reorganization cases"); *In re One–Eighty Investments, Ltd.*, 18 B.R. 725, 729 (Bankr. N.D.Ill.1981) (holding that in a reorganization, "the location of the assets of the Debtor is not particularly important").[13] Courts have stated that the consideration of the location of a debtors assets has greater weight if the bankruptcy case is brought in Chapter 7. *In re International*

---

13. As the court in *In re Conroe Forge & Mfg.*, 82 B.R. 781, 784 (Bankr.W.D.Pa.1988) stated: The policy behind Chapter 11 reorganization is successful rehabilitation ... However, the concept of reorganization includes liquidation ... This Court, therefore, must determine whether the property ... is necessary for an effective reorganization ... In a liquidating Chapter 11 where Debtor has ceased operations and collateral value is not decreasing, ordinarily all property will be necessary for an effective reorganization. "Necessary" property has been defined as that which " 'will contribute' to a plan of reorganization." ... If, as in this case, circumstances require confirmation of a sale before a liquidating plan has been confirmed, the proceeds, which will be earning interest, are necessary to the plan which presumably will provide for the sale of the rest of Debtor's assets and distribution of proceeds.

*Filter Corp.,* 33 B.R. 952, 956 (Bankr. S.D.N.Y.1983). Although this factor is generally not particularly probative of whether the transfer of venue should be granted or denied, this Court evaluates four (4) considerations attendant to this factor.

First, the sale of SJG's assets entails a sophisticated transaction requiring professionals experienced in this type of sale. Transactional lawyers, bankers, experts in utility regulations, are all key to a successful sale of SJG's assets and are all readily available in New York and may already be involved in the Debtors' cases. (The Court does not doubt that such transactional professionals also would be available in Puerto Rico. But the issue is reviewed in the context of whether cause exists to change venue from New York to Puerto Rico, not whether the sale could be accomplished in the District of Puerto Rico.) To the extent that a San Juan based professional may have to be retained for certain purposes (i.e. to facilitate the consummation of the sale), such is not unusual, nor would it necessarily increase costs.

In contrast however, if SJG's bankruptcy case was transferred to Puerto Rico merely because local professionals are available to consummate the sale of SJG's assets, SJG would probably need to retain local debtor's counsel and creditors' committee counsel, if a committee were to be formed. Enron Debtors' professionals, and to a certain extent the Committee and its professionals, would remain involved in SJG's case. Thus, a transfer to Puerto Rico would not result in a decrease in SJG's professional expenses, instead another layer of professional fees would be added.

There is no evidence that supports the view that a transfer to the District of Puerto Rico would increase the possibilities that a § 363(b)(1) sale would result in a greater sale price. Rather, New York, offers access to the capital markets, a broad range of potentially interested purchasers, and professionals that make these types of transactions successful (see *infra.*). In this case, the asset itself defines the degree of sophistication attendant to its sale, and the extent to which venue plays a role. The Court believes that currently retained professionals with assistance of local special counsel, if necessary, can achieve the sale of SJG's pipeline in an efficient manner that will yield a maximum return to its creditors.

Second, although SJG has announced its intention to sell its assets to facilitate its liquidating Chapter 11 plan, this is not a Chapter 7 liquidation.[14] The post-petition efforts in SJG's case center around a sale of SJG's assets within the context of Chapter 11. Unlike a Chapter 7 trustee sale, a sale of SJG's assets will be subject to the requirements of § 363(b)(1).[15] When con-

---

**14.** A Chapter 7 case is readily distinguished from a Chapter 11 liquidating case. Specifically, in a Chapter 7 case, the "Debtor likely requires greater court supervision over liquidation of the assets and there is no need to obtain financing. In such cases requiring the appointment of a trustee, it makes no sense to separate the trustee from the assets he is to liquidate or from the books and records he should examine. Where adjudication is in the offing, fairness to the creditors and the need for supervision strongly support placement of venue where the assets are located." *In re*

*International Filter Corp.,* 33 B.R. 952, 956 (Bankr.S.D.N.Y.1983).

**15.** Courts have required that a sale pursuant to § 363(b) be based upon the sound business judgment of the debtor. *See Licensing by Paolo v. Sinatra (In re Gucci),* 126 F.3d 380 (2d Cir.1997) ("[a] sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it"); *In re Chateaugay Corp.,* 973 F.2d 141 (2d Cir. 1992) (holding that there must be a good business reason to grant a motion to sell assets under Bankruptcy Code § 363(b));

sidering the type and nature of assets that will need to be sold, this Court is confident that the criteria that a sale must meet under § 363(b)(1) provides adequate safeguards against concerns that some creditors might have about the distance of this Court from SJG's assets.

Thus, when there is a sale of assets, firsthand familiarity with a debtor's locale is often unnecessary because the § 363(b)(1) sale process ensures that evidence will be offered to demonstrate the adequacy of a sale outside the ordinary course of business. Ultimately, if SJG's pipeline is sold, the value of SJG's pipeline will be an issue for this Court to consider at the sale hearing. Neither the location of the property nor the type of property poses any difficulty for this Court in conducting a valuation hearing. *See In re Bell Tower Assocs., Ltd.*, 86 B.R. 795, 803 (Bankr.S.D.N.Y.1988) (explaining that "there is no doubt that courts can and do value property far from the courthouse"); *In re Melgar Enters., Inc.*, 140 B.R. 43, 48 (Bankr.E.D.N.Y.1992) (explaining that where a valuation hearing is needed "appraisers have been called in to evaluate property located throughout the country without causing undue problems nor serious inconvenience for the witnesses involved"); *but cf. In re Developers of Caguas, Inc.*, 26 B.R. 977, 980 (Bankr. E.D.N.Y.1983) (explaining that transfer of venue was proper because a relief from stay motion was inevitable and that a valuation hearing would be necessary which would require an expert from Puerto Rico to testify at the creditor's expense; however, unlike SJG, debtor was the owner of vacant, dormant land that had been intended for development).

*Committee of Equity Sec. Holders v. Lionel Corp., (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir.1983); *See also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.Del.

Third, where debtors assets consist solely of real property, cases have held that transfer of venue is proper because "[m]atters concerning real property have always been of local concern and traditionally are decided at the situs of the property." *Baltimore Food*, 71 B.R. at 803; *see, e.g., In re BSJ Tower Assocs.*, 11 B.R. 449, 450 (Bankr.S.D.N.Y.1981) (holding that a transfer of venue from the Southern District of New York to the District of Puerto Rico was warranted where debtor's main asset was an office building in Puerto Rico and the core of debtor's case centered on a controversy over a real estate transaction in Puerto Rico that was the subject of litigation in Puerto Rico); *but see In re Holiday Towers, Inc.*, 18 B.R. 183 (Bankr. S.D.Ohio 1982). In contrast to this principle, the assets of SJG do not consist merely of real estate holdings, and no similar emphasis upon local concerns need be given. *See Baltimore Food*, 71 B.R. at 803.

Fourth, "the location of the debtor's assets is a factor that is outweighed by the need for administration of the case in this forum, where the debtor's," *Boca Dev. Assocs.*, 18 B.R. at 654, financing, professionals and related cases are located which is the Southern District of New York.

In conclusion, Movant has failed to carry its burden on this factor.

### b. Proximity of Witnesses and the Debtor to the Court

The proximity of the debtor and the availability of witnesses is a consideration which focuses on the debtor's "employees who must appear in court, not with the employees who are on the production line." *CORCO*, 596 F.2d at 1248; *Baltimore Food*, 71 B.R. at 802. Therefore, this Court must look to those employees of

1991) ("bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under section 363(b)(1) when a sound business purpose dictates such action").

SJG who are intimately familiar with the financial status of the company. *Id.*

### 1. Proximity of Witnesses

Movant has not made a clear showing of the extent to which live witnesses will be necessary. *See generally Hawaiian Investors v. H.L. Thorndal,* 339 F.2d 807, 810 (8th Cir.1965). It appears that the necessary participants in the proceedings before this Court will be the professionals retained in Debtors' cases and, if any SJG management personnel is necessary, those members of the management team would be from Houston, probably not Puerto Rico.[16] *Id.* Further, subject to Court approval, appearances required by the officers (or other management) can be addressed by telephonic and video conferencing capabilities.[17] *Id.* The limited, and likely infrequent, appearances that may be required of the principals should not cause any inconvenience. *See In re Shorts Auto Parts, Inc.,* 136 B.R. 30, 36 (Bankr.N.D.N.Y.1991); *In re Walston AirBusiness, Inc.,* 26 B.R. 955, 959 (Bankr.N.D.Ill.1983) (explaining that because an unsecured creditors committee had been formed in the home court, the number of potential witnesses from the outpost district was substantially reduced).

In conclusion, Movant has failed to carry its burden on this factor.

### 2. Proximity of Debtor

As for the proximity of the debtor to the court, this factor leans in favor of SJG as well. SJG's principal place of business is Puerto Rico. SJG's sole shareholder is based out of Houston, Texas. SJG's books and records, finance staff, managerial staff, human resources staff, and accountants are located in Houston, Texas. Key managerial and financial decisions are made in Houston, Texas, while much of the § 363(b)(1) sale and other reorganization efforts are focused in New York. However, BBV emphasizes the fact that the day-to-day operation of SJG's business takes place in Puerto Rico.

The court in *CORCO* was also asked to weigh the fact that operations and substantial assets of the Debtor were located in Puerto Rico against the fact that the financial management was in San Antonio. The court found in favor of retaining venue in San Antonio because the debtor's problems were financial and those who could solve these issues were in San Antonio, and therefore, *inter alia,* the case was not transferred to Puerto Rico. *CORCO; see also In re One–Eighty Investments, Ltd.,* 18 B.R. 725, 729 (Bankr.N.D.Ill.1981). As in *CORCO,* where the debtor's problems were financial and the resolutions of which did not necessarily lie in Puerto Rico, there are five (5) reasons why this consideration does not tend in favor of transfer of venue.

First, the primary issue here is the sale of a business that is part of a multinational conglomerate of energy concerns. The locale of a business' operation, either financial or business is not essential to the goal of a § 363(b)(1) sale.

Second, Movant argues that SJG's "nerve center" must be San Juan because

---

**16.** The professionals' participation will be more fully addressed in the discussion concerning the economic and efficient administration of the estate. *Enron,* 274 B.R. at 347.

**17.** On February 26, 2002, in the Enron Corp. case, this Court entered an Amended Case Management Order Establishing, Among Other Things, Noticing Electronic Procedures, Hearing Dates, Independent Website and Alternative Methods of Participation at Hearings ("Case Management Order") (Docket Entry # 1698). The Case Management Order governs, *inter alia,* procedures for addressing telephonic and video participation in order to facilitate participation by distant parties.

SJG's routine day-to-day operations are carried out in Puerto Rico. However, such a view ignores two (2) germane facts, mentioned previously: (i) that key managerial and financial decisions are made in Houston; and (ii) SJG's efforts to effectuate a § 363(b)(1) sale are focused in New York. These two (2) facts are pivotal because they define the bankruptcy considerations relevant to SJG's current state of affairs. SJG is no longer the same entity that it was before the bankruptcy filing. It is now a debtor-in-possession and with such a status it has abandoned its pre-petition existence to one now dependent on a different series of considerations. It is not enough that SJG personnel in San Juan exercise the immediate physical control over the facilities. What is instead of import to this case is the fact that executive decision-making in terms of SJG's Chapter 11 case does not lie in San Juan. Enron Corp. personnel in Houston and Debtors' professionals in New York: (i) make all strategic decisions for SJG; (ii) have the primary responsibility for conducting the sale of assets of SJG; and (iii) are responsible for all of SJG's reorganization efforts. Dowd Aff. ¶¶ 5, 6, 7. For SJG's bankruptcy case to succeed it is dependent upon a group of professionals and business people that have determined that this is the proper venue for the case. Were the venue to change, it would not result in a change in the key individuals that are making the decisions in SJG's case. Rather, a change in venue to Puerto Rico would simply make it that much less convenient for SJG's decision-makers to efficiently and economically administer SJG's estate. Therefore, Debtor's choice of venue is highly probative and should not be disturbed. Contrary to Movant's suggestion, this Court finds it cannot conclude that transferring the case to the District of Puerto Rico would necessarily place the nerve center of SJG in closer proximity to the court. Instead, this Court is of the view that the Southern District of New York is in closer proximity to the nucleus of SJG's post-petition nerve center as the parameters of such are defined by the "goals" of SJG's bankruptcy filing.

Third, in light of the fact that SJG is being actively marketed for sale, the proximity of SJG's operations to this Court is only relevant to the extent that it relates to the factor that considers the "location of the assets" to this Court, and as concluded above, the location of a debtor's assets is not dispositive in this case.

Fourth, SJG's business involves the operation of a gas pipeline. Presumably, the operation of SJG's business must continue uninterrupted until the sale of the assets in order to maintain its value for purposes of the § 363(b)(1) sale and there is no particular need for the case to be pending in Puerto Rico to achieve that goal.

Fifth, the presence of the books and records in Houston and or San Juan is not a major concern because with modern technology that information, which is ordinarily computerized, can be readily transported via electronic mail. *Enron*, 274 B.R. at 348. Important financial information is retained in both Puerto Rico and Houston and can be easily provided for any proceeding in New York. *In re Louis Marx & Co., Inc.*, No. 80B10150, 1980 Bankr.LEXIS 5204, at *11 (Bankr. S.D.N.Y. May 1, 1980) (explaining that financial data could be easily transmitted to New York if there was a need for the information); *In re PWS Holding Corp.*, Nos. 98–212–SLR through 98–223–SLR, 1998 Bankr.LEXIS 549, at *15 (Bankr.D. Del. April 28, 1998) (observing that technological advances "continue to diminish the importance of the 'convenience' factor").

In conclusion, Movant has failed to carry its burden on this factor.

### c. Economic and Efficient Administration of the Estate

It is clear that the most important of these considerations is the economic and efficient administration of the estate. *See e.g., CORCO,* 596 F.2d at 1247; *In re Landmark Capital Co.,* 20 B.R. 220, 224 (S.D.N.Y.1982); *Huntington Nat'l Bank v. Industrial Pollution Control, Inc. (In re Industrial Pollution Control, Inc.),* 137 B.R. 176, 182 (Bankr.W.D.Pa.1992); *In re Baltimore Food Sys., Inc.,* 71 B.R. 795 (Bankr.S.C.1986). This consideration encompasses all of the factors considered under the convenience of the parties. *In re Pinehaven Assoc.,* 132 B.R. 982, 989 (Bankr.E.D.N.Y.1991).

The central consideration to the "economic and efficient administration of the estate" inquiry is one that ultimately implicates the outcome of debtor's case, that is whether the debtor-in-possession will be able to formulate a plan that is acceptable to all relevant parties. *CORCO,* 596 F.2d at 1247. This consideration requires an analysis of the facts surrounding the post-petition efforts of the debtor-in-possession, *In re International Filter Corp.,* 33 B.R. 952, 956 (Bankr.S.D.N.Y. 1983), particularly the fact that SJG is heading towards a sale of its assets. This Court will evaluate several considerations in light of this standard.[18] As set forth below, Movant has failed to carry its burden on this factor.

### 1. Southern District of New York Affords Greater Access to Capital

SJG's liquidating Chapter 11 is dependent upon the ability of SJG to sell its assets to thereby maximize a return for creditors. This effort requires SJG, the Enron Debtors, the professionals retained in this case, and the Creditors Committee to structure a transaction that takes advantage of New York's capital markets and the relationships that Debtors have with the New York financial community. *See generally In re HME Records, Inc.,* 62 B.R. 611, 614 (Bankr.M.D.Tenn.1986) (denying transfer of venue to New York because, *inter alia,* debtor had established business relationships with local banks). SJG has already benefitted by this case being in New York by virtue of the fact that it received DIP financing from Enron Corp. whom itself received funding through its association with New York based lenders. Further, SJG is dependent upon access to this market in order to gain maximum value for the sale of its assets.

New York is a world financial center and, as such, has the resources that will be required to address the Debtors' financial issues. *Enron,* 274 B.R. at 349. Most of the entities and individuals expected to be responsible for SJG's liquidating Chapter 11 plan are located in New York or have ready access to New York, including most of the Debtors' legal and financial advisors as well as the legal and financial advisors to the Committee and the lenders. *See Id.* Furthermore, while SJG's management is predominantly in Houston and Puerto Rico, New York is a more convenient location for those responsible for consummating a sale of SJG's assets and formulating a liquidating plan. *See Id.* The Court finds that New York is the more economic and convenient forum for those whose partic-

---

**18.** In considering the economic and efficient administration of the estate, the learning curve issue is an important factor. However, the learning curve also impacts considerations of the interest of justice which seeks to promote the efficient administration of the estate, judicial economy. To avoid duplication of issues, the Court will address the applicable learning curve with respect to the interest of justice prong of 28 U.S.C. § 1412.

ipation will be required to administer these cases. *In re Louis Marx & Co., Inc.*, No. 80B10150, 1980 Bankr.LEXIS 5204, at *11 (Bankr.S.D.N.Y. May 1, 1980). Accordingly, New York is the location which would best serve the Debtors' efforts to preserve value.

### 2. Sale of Assets Can Be Effectively Accomplished in the Southern District of New York

The Court recognizes that central to the post-petition efforts of SJG, is the sale of the debtor-in-possession's assets. *In re Louis Marx & Co., Inc.*, No. 80B10150, 1980 Bankr.LEXIS 5204, at *11 (Bankr. S.D.N.Y. May 1, 1980) (explaining that New York was the focal point of the efforts to obtain debtor financing and to find a prospective purchaser of assets). Movant argues that if SJG attempts to sell its San Juan pipeline assets, SJG will nonetheless be required to retain local professionals in order to consummate the sale. (Tr. 271 line 13 to 272 line 18.) In support of this position, Movant states that under the laws of the Commonwealth of Puerto Rico a notary public must be retained to complete a real property transaction. (Tr. 271 line 13 to 272 line 18.) In Puerto Rico, notaries public have heightened duties, as compared to notaries public in other parts of the United States, and are required to attest to the accuracy of the contents of a document. (Tr. 271 line 13 to 272 line 18.) However, the exact contours of the sale transaction are not yet known. Debtors' counsel states that a sale of the assets might not need to occur and it could be a stock sale, and therefore would not require the services of a notary public from Puerto Rico. Regardless, this (retention of a local professional) by itself is an insufficient reason to transfer the case. *CORCO*, 596 F.2d at 1248 n. 20 (explaining that although certain matters required application of Spanish civil law that fact alone was an insufficient basis for justifying trans-

fer). More importantly, as noted earlier, retention of local counsel (or other professional) for a special purpose is not unusual or necessarily costly.

What is highly probative however is the fact that there are people familiar with the management and the sale of SJG in New York, Houston and Puerto Rico. *See In re Garden Manor Assocs., L.P.*, 99 B.R. 551, 554 (Bankr.S.D.N.Y.1988). As SJG management and Enron Corp. negotiate the sale of SJG's assets from New York and Houston, the Court concludes that it would be most efficient for the administration of this Chapter 11 case to take place within the Southern District of New York. *See In re Holiday Towers, Inc.*, 18 B.R. 183, 189 (Bankr.S.D.Ohio 1982); *In re Louis Marx & Co., Inc.*, No. 80B10150, 1980 Bankr.LEXIS 5204, at *13 (Bankr. S.D.N.Y. May 1, 1980).

### 3. Southern District of New York Offers Economical Case Administration

In *CORCO*, the persons charged with financial responsibility were all located in San Antonio, and thus venue was properly retained in Texas. The same situation exists in the instant case, Enron Corp. staff in Houston, and the Enron Debtors' professionals in New York, will be working on the liquidating Chapter 11 plan of SJG. *In re Louis Marx & Co., Inc.*, No. 80B10150, 1980 Bankr.LEXIS 5204, at *11 (Bankr.S.D.N.Y. May 1, 1980) (explaining that New York was more convenient for debtor's parent company). As a result, SJG can be administered much more economically in New York than in Puerto Rico since the professionals, financial markets and expertise are already in place and have made progress towards the sale of SJG.

### 4. "Intertwined Relationships" of SJG and Enron Corp.

Under this category, a significant factor to be considered is the "intertwined rela-

tionships" of affiliated debtors.[19] *In re Hudik–Ross Co.*, 198 F.Supp. 695, 700 (S.D.N.Y.1961); *In re Hadar Leasing Int'l Co., Inc.*, 14 B.R. 819, 820 (S.D.N.Y.1981); *In re Andover Data Servs., Inc.*, 35 B.R. 297, 301 (Bankr.S.D.N.Y.1983) (removing a bankruptcy case filed in the District of Maryland because it was "irrevocably intertwined by virtue of . . . common ownership" to a case filed in the Southern District of New York); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 149 B.R. 365, 369 (Bankr.S.D.N.Y.1993); *In re Waits*, 70 B.R. 591, 595 (Bankr.S.D.N.Y.1987); *In re Portjeff Dev. Corp.*, 118 B.R. 184, 193 (Bankr.E.D.N.Y.1990) (observing that "[w]here the affairs of several debtors are interrelated . . . economical and efficient administration similarly dictates that all the proceedings be supervised by one United States Trustee and be centered in one bankruptcy court"); *In re One–Eighty Investments, Ltd.*, 18 B.R. 725, 729 (Bankr. N.D.Ill.1981); *In re Bankers Trust*, 403 F.2d 16 (7th Cir.1968).

The close relationship between Enron Corp. and SJG is characterized by three (3) important facts tending in favor of retaining venue in the Southern District of New York: (i) SJG is a wholly-owned subsidiary of Enron Corp. engaged in the same industry; (ii) Enron Corp. is guarantor on obligations owed by SJG to BBV; and (iii) Enron Corp. has provided a postpetition DIP facility to SJG.

First, SJG is a wholly-owned subsidiary of Enron Corp. engaged in the same industry. As a rule, parent and subsidiary corporations are separate entities, having separate assets and liabilities. *See, e.g., In re Regency Holdings*, 216 B.R. 371, 376 (Bankr.S.D.N.Y.1998). However, the "in-

tertwined relationship" analysis does not necessarily require this Court to examine whether SJG and Enron Corp. have shared assets and liabilities. In *In re Pope Vineyards*, the debtor, Pope Vineyards ("Pope") was based in Napa County, California but filed for voluntary Chapter 11 in the Southern District of Texas. *Pope Vineyards*, 90 B.R. 252 (Bankr. S.D.Tex.1988). Pope was in the business of grape growing and wine making. *Id.* All of Pope's common stock was owned by Buttes Gas and Oil Company which, along with a number of related and subsidiary companies involved in the energy business ("Buttes") filed Chapter 11 petitions in the Southern District of Texas. *Id.* Based upon Buttes's venue in the Southern District of Texas, the Pope bankruptcy case was filed in that same district. *Id.* In granting the creditors transfer of venue, the court, *inter alia*, turned to the relationship between the debtors. *Id.* The court observed that Pope was the only wholly-owned subsidiary of Buttes' that was in the business of grape growing and wine making. *Pope Vineyards*, 90 B.R. at 259. Then the court observed that Buttes was in the energy business, and that Pope was its only non-energy company. *Id.* The court then explained that economic administration would be effected by a transfer of venue because the debtors industries and businesses had different sets of considerations and if Pope were not transferred, it would become entangled in the Buttes cases. *Id.*

Although the *Pope Vineyards* decision is instructive, to the extent it is viewed as presenting a uniform principal to be observed in all parent and subsidiary reorganizations, this Court would not agree. However, even if the Court were to adopt

---

**19.** This factor is not determinative of whether all or some of these cases should be substan-

tively consolidated.

such a uniform principal, application of the *Pope Vineyards* analysis in this case demonstrates that a change of venue is not warranted for two (2) reasons. First, as a wholly-owned subsidiary of Enron Corp., there is no dispute that Enron Corp. and SJG are in the same industry, namely the energy business. Second, a fundamental component of the Enron Debtors' cases involves the sale of assets. As a result, in the context of the Enron Debtors' cases, SJG's proposed asset sale is not unusual and is not at risk of becoming entangled or lost in the Enron Debtors' cases. As a result, *Pope* counsels this Court to conclude that SJG should be administered in the Southern District of New York.

Second, Enron Corp. is the guarantor of the obligations owed by SJG to BBV. BBV has recognized that to obtain complete relief it needs to pursue its claims in this Court and in fact it has filed a proof of claim against Enron Corp. In *In re Ridgely Communications, Inc.*, the court found that debtor Ridgely was a closely-held corporation of which two-thirds of the stock was owned by Anne and David Kramer, affiliated debtors. The court opined that because the Kramers were guarantors of obligations to Ridgely's two (2) largest secured creditors there were common questions of law and fact that would materially affect the reorganization of both debtors. Thus, in denying a creditor's motion to transfer venue, the court concluded that the "administration of ... closely-related cases will be rendered more difficult and expensive if ... separated." *In re Ridgely Communications, Inc.*, 107 B.R. 72, 78–79 (Bankr.D.Md.1989). Likewise, in SJG's case, it would be inefficient for claims arising out of the same obligations (namely, the guaranty agreement and the credit agreement) to proceed simultaneously in two (2) courts.

Third, Enron Corp. is the DIP Lender of SJG, and thus a superpriority lienholder of SJG's estate. As set forth in the Motion for SJG Operating Funds, SJG received the best available lending terms from Enron Corp. Motion for SJG Operating Funds ¶ 20. The borrower-lender relationship here is compelling. Enron Corp. as the DIP lender therefore has a significant stake, not only as SJG's parent corporation, but as post-petition creditor. This post-petition relationship between Enron Corp. and SJG is important to both and should continue under the supervision of this Court. *See generally In re Walston AirBusiness, Inc.*, 26 B.R. 955, 959 (Bankr.N.D.Ill.1983) (explaining that interim financing was provided by a local area lender and the financing was earmarked to facilitate the debtor's business operations).

Thus, it appears to this Court that the "intertwined relationships" of SJG and the Enron Debtors leads to the conclusion that a transfer of venue is not warranted.

### 5. *Local Considerations*

Although neither party raised this issue, another consideration under this category is, whether SJG's case is of such local concern that it should proceed in Puerto Rico. *In re Newport Creamery*, 265 B.R. 614, 618 (Bankr.M.D.Fla.2001); *In re Standard Tank Cleaning Corp.*, 133 B.R. 562, 567 (Bankr.E.D.N.Y.1991); *In re Portjeff Dev. Corp.*, 118 B.R. 184, 193 (Bankr.E.D.N.Y.1990); *In re Toxic Control Techs., Inc.*, 84 B.R. 140, 143 (Bankr. N.D.Ind.1988); *Indian Motocycle Co., Inc.*, 266 B.R. 243, 267 (Bankr.D.Mass. 2001).

The Court recognizes that this may be a relevant consideration in light of two (2) circumstances: (i) SJG has been the subject of regulatory action in Puerto Rico; and (ii) SJG has a monopoly, in accordance with local statute, to furnish propane gas to San Juan. However, Movant has failed

to address this consideration. Moreover, it is impossible to ascertain whether regulatory action: (i) has been concluded or if it is ongoing; and (ii) must be resolved in Puerto Rico or if it will be resolved elsewhere. This Court therefore is unable to fully evaluate the relative importance of this factor.

However, it is highly probative that the Change of Venue Motion was not joined or supported by any governmental entity, or by any other creditor. Further, SJG has represented that the DIP credit facility provided by Enron Corp. would be applied, *inter alia,* to meet any outstanding regulatory obligations to OSHA, DOT and EPA. Motion for SJG Operating Funds ¶ 6. The agencies that might be concerned with either the regulatory action against SJG or the regulatory contract under which SJG operates have not voiced dissatisfaction over SJG's choice of venue. Thus, this Court finds that it has not been established that this factor supports a transfer of venue.

### 6. Unsecured Creditors' Committee is Already in Place in the Southern District of New York

The Court finds it relevant to weigh the position of the Committee in its statutory role as a fiduciary to and representative body of the unsecured creditors of all the estates, including SJG. The Committee consists of representatives of all of the creditor constituencies. As such, the position of the Committee, while not dispositive, is something that should be considered by the Court. *See Huntington Nat'l Bank v. Industrial Pollution Control (In re Industrial Pollution Control, Inc.),* 137 B.R. 176, 181 (Bankr.W.D.Pa.1992) (noting opposition to transfer by Committee of Unsecured Creditors); *In re Windtech, Inc.,* 73 B.R. 448, 451 (Bankr.D.Conn.1987)

(same); *In re Kerr's Inc.,* 253 F.Supp. 742, 744 (Bankr.S.D.N.Y.1966) (holding that debtor's case was improperly venued in the Southern District of New York and further that the court declined to retain venue under the statutory precursor to § 1412 because, *inter alia,* the creditors' committee took no position on the motion to transfer venue).

However, the factors involving the proximity of this Court to "most of the creditors are not significant here, since the creditors' committee ... [has] voiced [its] support in favor of the debtor's choice of venue." *Boca Dev. Assocs.,* 18 B.R. at 654. Counsel for the Committee has indicated the Committee's strong opposition to a transfer of the bankruptcy case. The Committee and its counsel are based in New York and have been involved in the administration of SJG's and Enron Debtors' estates, and thus have a familiarity with the issues of these cases. *In re Louis Marx & Co., Inc.,* No. 80B10150, 1980 Bankr.LEXIS 5204, at *13 (Bankr. S.D.N.Y. May 1, 1980); *In re Walston AirBusiness, Inc.,* 26 B.R. 955, 959 (Bankr. N.D.Ill.1983).

Moreover, as noted previously, Movant advises this Court that it is unlikely that a statutory creditors' committee would be appointed if SJG's case was transferred to Puerto Rico. (Tr. 258 line 16 to line 22.) Instead, Movant envisions the United States Trustee as taking an active role in SJG's case. (Tr. 259 line 2 to line 22.) This Court does not know the reliability of Movant's assertion. Nonetheless, for purposes of this analysis, the Court accepts Movant's argument and weighs the value of having the existing creditors' committee with its fiduciary obligations to all the creditors of all the estates and available transactional professionals to advise it with the prospect of no committee at all.[20] In

---

**20.** It is important to note that the interests of all estates, including SJG, are clearly aligned.

so doing, this Court believes that retaining SJG in the Southern District of New York furthers the overall goals of the Code.

### d. The Proximity of Creditors (and Stockholders)

In considering the proximity of creditors (and stockholders), this Court must examine both the number of creditors as well as the amount of claims held by such creditors. *See CORCO,* 596 F.2d at 1248. The governing standard is the proximity of the creditors to the court, not the creditors' choice of forum. *See In re Hadar Leasing Int'l Co.,* 14 B.R. 819, 821 (S.D.N.Y.1981). However, even if this factor were to strongly favor "transferring venue, this factor alone would not be determinative." *In re Island Club Marina, Ltd.,* 26 B.R. 505, 507 (Bankr.N.D.Ill.1983).

### 1. Proximity of Creditors

Initially, the Court notes that the Change of Venue Motion did not include a complete analysis of this factor. The Court has examined SJG's schedules and statement of financial affairs filed on September 30, 2002. This examination revealed that all but one (1) of the top twenty (20) largest unsecured creditors is based in Puerto Rico, and that the majority of claims in dollar amount are located in Puerto Rico.

Movant argues that due to the distance of this Court from creditors in Puerto Rico that there is probably a reduced level of creditor participation in SJG's case. And that if SJG's case was transferred to the District of Puerto Rico there would be greater creditor participation. As a general proposition this is an accurate statement. However, at the hearing on the Change of Venue Motion, Counsel for BBV

stated that if the case were transferred to the District of Puerto Rico, the United States Trustee would become very active in this case because it is unlikely that a creditors' committee would be formed (see *supra.*). Thus, in spite of Movant's argument, Movant presents a contrary outcome, that is, transferring venue to the District of Puerto Rico would not increase creditor participation; rather, it would probably have little or no effect on creditor participation.

At least with respect to the Movant, the argument that the location of this case in the Southern District of New York is chilling the creditors' efforts is further undermined by the fact that BBV has an office in New York and Movant has counsel actively involved in SJG's case and the Enron Debtors' case. Specifically, Enron Corp. is the guarantor of the obligations owed by SJG to BBV pursuant to a credit agreement. BBV has recognized that to obtain complete relief it needs to pursue its claims in this Court and in fact it has filed a proof of claim against Enron Corp. The Court anticipates Movant's continued participation in this case, as well as participation by any other interested creditor wherever located. *See In re HME Records, Inc.,* 62 B.R. 611, 614 (Bankr. M.D.Tenn.1986). It is reasonable to expect that creditors such as Movant will travel to New York for these proceedings. Particularly in light of the fact that the burden of travel is greatly mitigated by the convenience and speed of the airplane. *Texaco Inc. v. Sanders (In re Texaco Inc.),* 182 B.R. 937, 949 (Bankr.S.D.N.Y.1995). Further, as has been the experience of this Court in Enron, and other cases, participation via telephonic means has enabled

---

In that, to the extent that BBV's claim is unpaid by SJG's estate, it can look to recover any unpaid amount from the estate of Enron Corp. because Enron Corp. is the guarantor

of SJG's obligation to BBV. Therefore, it is clear that it is in the interest of all parties to maximize the recovery to SJG's creditors.

anyone who sought to actively participate in the case an opportunity to do so.

With respect to accessibility of this Court to all parties-in-interest, the dockets of all of the cases pending before the Southern District of New York are currently available on the internet at the Court's web-site by obtaining a PACER password. *Enron,* 274 B.R. at 347. The electronic filing system allows those with an interest to have access to all pleadings filed in any case. *Id.* Moreover, pursuant to the Federal Rules of Bankruptcy Procedure, any pleading that directly impacts any employee or creditor is required to be served upon such individual or entity. *Id.* In addition, the Court will make every effort to afford those burdened by the cost of travel an opportunity to participate by alternative means as previously mentioned. *Id.*

### 2. Proximity of Stockholders

The Court in *CORCO* stated that when evaluating the proximity of creditors to the court, it is appropriate to consider the debtor's stockholders. *CORCO,* 596 F.2d at 1248; *In re Bell Tower Assocs., Ltd.,* 86 B.R. 795, 801 n. 6 (Bankr.S.D.N.Y.1988) (explaining that the proximity of equity security holders is a factor under *CORCO*); *In re Baltimore Food Sys., Inc.,* 71 B.R. 795, 802 (Bankr.S.C.1986). This entails a case-by-case analysis.

In *CORCO,* the court concluded that, as part of the proximity of creditors factor, the proximity of stockholders to the court needed to be considered. The court con-

cluded that the proximity of the creditors and stockholders did not warrant a change of venue from San Antonio to Puerto Rico.[21] 596 F.2d at 1248. In reaching this conclusion, the court reasoned that the controlling shareholder, Tesoro Petroleum, was the largest shareholder of CORCO owning 37.6% of CORCO's common stock, and Tesoro Petroleum was located in San Antonio. *Id.* In contrast, the court explained that only 1.62% of CORCO's shareholders were residents of Puerto Rico. *Id.* Thus, the *CORCO* court examined the locale of the controlling stockholder and concluded that a change of venue was not warranted.

In many cases, stockholders are usually so far "out of the money," that their location would usually not be relevant to this consideration. *See generally In re Bell Tower Assocs., Ltd.,* 86 B.R. 795, 801 n. 6 (Bankr.S.D.N.Y.1988) (explaining that when debts owed to creditors are more than the value of the interest of equity security holders, the location of equity security holders is not as compelling). However, even in those cases where the stockholders may be "out of the money," and as such there is no likelihood of recovery of their equity, the locale of the controlling stockholder, *CORCO,* 596 F.2d at 1248, may be a relevant factor for a court to consider when the controlling stockholder is effectively the debtor's manager.

SJG's schedules disclose total liabilities of $22,325,041. According to Movant, the sale of SJG's assets may result in a price

---

**21.** In *In re Island Club Marina, Ltd.,* 26 B.R. 505, 507 (Bankr.N.D.Ill.1983), a case dealing with limited partners as equity security holders, the court lent further support for *CORCO's* conclusion that the proximity of equity security holders, should be considered when analyzing a request for change of venue. *Island Club,* 26 B.R. at 507. In explaining the justification for considering the proximity of equity security holders, the court explained

that "this concept is … supported by Bankruptcy Code Section 501(a), which allows equity security holders … to file a proof of claim against debtor. *Id.* Thus, under the Bankruptcy Code, equity security holders are akin to creditors." *Id.* (citations omitted). The *Island Club* court took the view that equity security holders are in essence creditors and should be taken into account in the analysis of the number and size of creditors.

of $8–10 million. (Tr. 260 line 20 to 261 line 2.) In SJG's case, it is not expected that Enron Corp., as sole shareholder and parent corporation of SJG, will realize a recovery of its equity investment in the form of upstream payments vis a vis SJG's plan. Thus, it appears that Enron Corp. will derive no direct financial benefit from SJG's bankruptcy case. However, as more fully set forth above (see *supra.* section on "Intertwined Relationships") three (3) facts evidence Enron Corp.'s significant interest in the outcome of the SJG bankruptcy case: (i) SJG is a wholly-owned subsidiary of Enron Corp. engaged in the same industry; (ii) Enron Corp. has provided a post-petition DIP facility to SJG; and (iii) Enron Corp.'s guaranty of the Movant's loan to SJG.

First, Enron Corp., as an affiliated debtor-in-possession and controlling stockholder of SJG, selected the Southern District of New York for venue. Pursuant to this Court's Decision Denying Change of Venue, Enron Corp. Debtors were allowed to maintain venue in this district. In Enron Corp.'s dual capacity as affiliated debtor-in-possession and controlling stockholder of SJG, it has executive decision-making in terms of SJG's Chapter 11 case. Enron Corp. personnel in Houston and Debtors' professionals in New York: (i) make all strategic decisions for SJG; (ii) have the primary responsibility for conducting the sale of assets of SJG; and (iii) are responsible for all of SJG's reorganization efforts. In SJG's case, venue, executive decision-making, and post-petition professional services are inextricably linked to its controlling stockholder, one of the largest Chapter 11 cases ever filed. Aside from the benefits that SJG will derive from the economies of scale offered by maintaining venue in the Southern District of New York, the controlling stockholder has availed itself of this district and therefore SJG is in close proximity to its controlling stockholder. The choice of venue of SJG and its controlling stockholder ought not be disturbed.

Second, as DIP lender, Enron Corp. provided necessary funds to SJG. These funds are being used so that SJG can continue operating. This is significant because absent this funding, SJG ran the risk of violating the regulatory contract with the Puerto Rico Public Service Commission. Such a violation could have resulted in civil and criminal sanctions against SJG and Enron Corp. Because Enron Corp., as debtor-in-possession, is venued in the Southern District of New York its capacity as DIP lender is relevant. The DIP funds were provided to a debtor in the Southern District of New York from another debtor venued in this district. The primary reason for Enron Corp.'s decision to step in and provide the DIP facility was because it was the controlling stockholder of SJG and preserving SJG's value was clearly in its (Enron Corp.'s) interests. This transaction took place in New York, not Houston, and not Puerto Rico.

Third, as guarantor of the Movant's loan to SJG, Enron Corp. and its creditors have a mutuality of interests with all the creditors of SJG, in that each dollar of proceeds received from the sale of SJG or its stock reduces the Movant's guaranty claim against Enron Corp. estate.

### 3. Summary of Analysis of the Proximity of Creditors (and Stockholders) Factor

Although as mentioned previously, a transfer of venue to the District of Puerto Rico would provide the twenty (20) largest creditors easier direct access to the bankruptcy court presiding over the case. Taking into the consideration the issues discussed herein, specifically the purpose and anticipated results of the SJG filing, the

Court reaches the same conclusion as the court in *CORCO*, that is "[o]n balance, the proximity of creditors and stockholders favors" SJG's choice of venue. In conclusion, Movant has failed to carry its burden on this factor.

### e. The Necessity for Ancillary Administration if Liquidation Should Result

This Court finds it unnecessary to contemplate the failure of this case at this early stage. As the court in *CORCO* explained, "[a]nticipation of the failure of the Chapter XI proceeding is an illogical basis upon which to predicate a transfer." *CORCO*, 596 F.2d at 1248, *quoting Fairfield*, 333 F.Supp. 1187, 1191 (D.Del.1971). Although SJG intends to sell its pipeline assets, there is no indication that the bankruptcy case will be converted to a Chapter 7 liquidation proceeding.

In conclusion, Movant has failed to carry its burden on this factor.

### f. Summary of Analysis of the Convenience of the Parties

Since the purpose of considering these various factors with respect to the convenience of the parties is not meant to shift the inconvenience, and where after balancing all of the factors, the equities do not lean heavily in favor of the Movant, SJG's choice of forum should not be disturbed. *In re Garden Manor Assocs., L.P.*, 99 B.R. 551, 554 (Bankr.S.D.N.Y.1988); *In re Great American Resources, Inc.*, 85 B.R. 444, 445(Bankr.N.D.Ohio 1988) *citing In re Legend Indus., Inc.*, 49 B.R. 935, 938 (Bankr.E.D.N.Y.1985). Similar to the court's conclusion in *Fairfield*, this Court finds that, regardless of the location of SJG's assets, the formulation of SJG's liquidating Chapter 11 plan, and the forthcoming asset sale, will take place in New York. Thus, a practical approach counsels that this case should remain venued in the Southern District of New York.

### ii. Interest of Justice

The second consideration pursuant to § 1412 involves an analysis of the "interest of justice."

### a. It is in the Interest of Justice to Deny Transfer of Venue

The interest of justice prong is a broad and flexible standard that is applied based on the facts and circumstances of each case. *Enron*, 274 B.R. at 349 *citing Manville*, 896 F.2d at 1391. In evaluating the interest of justice, the Court must consider what will promote the efficient administration of the estate, judicial economy, timeliness and fairness. *Enron*, 274 B.R. at 349 *citing Manville*, 896 F.2d at 1391; *see also In re Pinehaven Assoc.*, 132 B.R. at 990 (explaining that this factor "encompasses, among other things, inquiry as to the forum which facilitates the efficient, proper and expeditious functioning of the courts. Although vague, this inquiry would include looking into the desirability of having a judge familiar with applicable law hear and determine issues arising in the case"); *In re Raytech Corp.*, 222 B.R. 19, 26 (Bankr.D.Conn.1998). The Court finds that the considerations involved with the interest of justice are intertwined with the economic and efficient administration of the estate. *Enron*, 274 B.R. at 349. As already discussed, the administration of this estate will be best promoted by retaining venue in this Court. *Id.* This Court will examine three (3) considerations attendant to this factor.

First, this Court is confident that there will be a delay in the administration of the SJG case if it were transferred to Puerto Rico from the Southern District of New York, because new professionals would need to be retained and be required to immediately become familiar with the case. *In re Louis Marx & Co., Inc.*, No.

80B10150, 1980 Bankr.LEXIS 5204, at *13 (Bankr.S.D.N.Y. May 1, 1980).

■ Second, in considering both the efficient administration of the estates and judicial economy, it is also necessary to take account of the "learning curve." *See Enron,* 274 B.R. at 349, *citing In re Vienna Park Properties,* 125 B.R. 84, 87 (S.D.N.Y.1991); *also generally Hawaiian Investors v. Thorndal,* 339 F.2d 807, 810 (8th Cir.1965) (explaining that one of the reasons for denying change of venue was because the bankruptcy referee had held many hearings and devoted significant time to the case and was thoroughly familiar with the case). The learning curve analysis involves consideration of the time and effort spent by the current judge and the corresponding effect on the bankruptcy case in transferring venue. *In re Vienna Park Properties,* 125 B.R. at 87 (finding that the bankruptcy court did not err in considering the learning curve).

In *Manville,* the Second Circuit found that although the convenience of the parties and witnesses weighed in favor of transfer (which this Court has not found), the efficient administration of the case, such as the fact that the bankruptcy court had developed a substantial learning curve, weighed in favor of retention of the case. *See Enron,* 274 B.R. at 349, *citing Manville,* 896 F.2d at 1391.

SJG's case bears upon the overall reorganization efforts of the Enron Debtors. The synergy between Debtors' cases is highly relevant to this consideration (just one example is the Final Order approving the DIP loan involves both Enron Corp. and SJG).

Third, consistent with the above stated conclusion that, for purposes of this venue analysis, there is an "intertwined relationship" between SJG and Enron Corp. that tends in favor of retaining venue in the Southern District of New York, this Court recognizes that historically courts observed a general policy of allowing a parent and subsidiary to reorganize in the same court. *See generally Duggan v. Sansberry,* 327 U.S. 499, 511, 66 S.Ct. 657, 90 L.Ed. 809 (1946) (disallowing a collateral attack of a reorganization proceeding under the Act in view of Congress' policy that one Court have exclusive jurisdiction over a debtor and its property), *also In re Tonkawa Refining Co.,* 502 F.2d 1341, 1343 (10th Cir.1974).

A central objective of bankruptcy is to allow debtors to bring order to their affairs. *See generally In re Coleman American Cos.,* 8 B.R. 384, 389 (Bankr.Kan. 1981), *also Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47 (2d Cir.1976). In meeting this objective, centralization of parent and subsidiary debtors in the same district may be in the interest of justice. Such is the case in SJG's bankruptcy proceedings.

■ Centralizing the cases of parent and subsidiary debtors furthers the objectives of the Code by preventing an unsystematic scramble for a debtor's assets. Centralization of parent and subsidiary cases insures that debtors' cases will be administered in a single court in order to: (i) avert contradictory decisions of different courts; and (ii) synchronize all the creditors interests with one another. This view is in accord with § 1412. Holding otherwise would cause parent debtors to expend considerable resources to travel to other jurisdictions. Parent debtor corporations that could not afford the costs attendant to administration of subsidiary cases in a multiplicity of jurisdictions would be confronted with a patchwork of decisions that would ultimately prejudice the interests of creditors.

### b. Summary of Analysis of the Interest of Justice

The goal of SJG's Chapter 11 case is to pay its creditors through a liquidating

Chapter 11 plan. The parties most essential to that purpose are located in New York and Houston or have otherwise availed themselves of New York. SJG's assets will likely be sold, and that transaction will be most easily accomplished by utilizing the resources based in New York. This will necessitate involvement by the professionals retained by the Debtors, and the Committee which are all primarily located in New York. *Enron,* 274 B.R. at 350. Thus, the significant financial and legal decisions concerning SJG will be made in New York. *Id.* at 351. The fact that New York is a financial center and the presence in New York of those who will participate in the sale of SJG makes New York the most efficient forum for administering this case. *Id.* For the reasons set forth above, transferring venue would be inefficient and wasteful, and would be contrary to the interests of judicial economy, timeliness, and fairness. Similar to the court's conclusion in *CORCO,* this Court finds that SJG should remain venued in the Southern District of New York because SJG's financial problems will be most readily addressed in this district and remaining in this district will present the least disruption for SJG's case.

The Court finds that in considering matters of judicial economy, timeliness and fairness as well as the efficient administration of the estate, the interest of justice is served by retaining venue in the Southern District of New York.

In conclusion, Movant has failed to carry its burden on this factor.

### IV. Conclusion

Underlying Movant's request for a change of venue of SJG, is the concern that—because, as the parties have stated, SJG is a "small" part of the Enron bankruptcy case—SJG's assets will be sold at fire sale prices at the expense of local creditors and interests. Further, Movant stresses the costs attendant to New York professionals. This Court adheres to the view that one of the principal aims of the Bankruptcy Code is to maximize value for creditors. Any sale conducted in this Court must meet the standards under § 363(b)(1), and the fees, and any allocation of such fees, of all professionals are subject to approval by this Court.

Fragmenting this case by giving way to parochial interests will merely serve to undermine an efficient and successful § 363(b)(1) sale and the overall reorganization of the Debtors. The outcome of starting down a path of fragmentation will surely lead to disparate court decisions, and potentially, courts working at opposing ends. *See generally In re Blumeyer,* 224 B.R. 218, 221 (Bankr.M.D.Fla.1998) (holding that debtor's Chapter 11 case be transferred to the same venue where debtor's spouse's Chapter 7 case was pending because holding otherwise would result in fragmentation and duplication of the administration of the debtor's case and her spouse's case); *In re Alexander,* No. 98–11844, 1999 WL 240336, *4, 1999 Bankr.LEXIS 408, at *19 (Bankr.D.Vt. April 14, 1999). Granting Movant's motion would result in fragmentation of these bankruptcy proceedings to the detriment of SJG's creditors and all of the Enron estates. *See In re Infiltrator Sys., Inc.,* 248 B.R. 715, 716 (Bankr.D.Conn.2000) (explaining "that the creditor's claim of inconvenience is more than offset by the interests of other creditors to preserve the assets of the debtor's estate"); *Gerstl v. Galanis (In re Galanis),* 6 B.R. 900, 905 (Bankr.D.Conn.1980) (explaining that "[t]aking into account the acknowledged national scope of [debtor's] business operations any factor increasing the likelihood of fragmented proceedings militates against

practical and economical administration of the estate").

In light of the foregoing factors, particularly the importance of the economic and efficient administration of the estate, venue of this case shall be retained by the Southern District of New York. It is in the Southern District of New York—where SJG actually administers the estate—that the convenience of the parties will best be satisfied and the interest of justice will best be served. The Court finds that the Movants have not shown by a preponderance of the evidence that transfer of venue is in the interest of justice or for the convenience of the parties. For the reasons stated herein, this Court will retain venue of SJG's bankruptcy case.

Based on the foregoing, it is

ORDERED, that the Motion for Change of Venue brought by Banco Bilbao Vizcaya Argentaria Puerto Rico is hereby denied.